**In re TENN–FLA PARTNERS, a Tennessee General Partnership, Debtor.**

**FIRST UNION NATIONAL BANK OF FLORIDA, as Trustee, Plaintiff,**

**v.**

**TENN–FLA PARTNERS, Defendant.**

**Bankruptcy No. 92–27624–B.
Adv. No. 94–0201.**

United States Bankruptcy Court,
W.D. Tennessee,
Western Division.

Aug. 4, 1994.

---

Henry C. Shelton, III, C. Bradford Foster, III, Evans & Petree, Memphis, TN (Bruce A. Markell, of counsel), Professor of Law, Indiana University School of Law, Bloomington, IN, for debtor.

Jack F. Marlow, Memphis, TN, for Howe Solomon & Hall, Inc.

Frank J. Glankler, Jr., Glankler, Brown, Gilliland, Chase, Robinson & Raines, Memphis, TN, for Dr. Meyer.

Frank P. Terzo, Semet, Lickstein, Morgenstern, Berger, Friend, Brooke & Gordon, P.A., Coral Gables, FL, for Howe Solomon & Hall, Inc.

Robert T. Hyde, Jr., Rogers, Towers, Bailey, Jones & Gay, P.A., Jacksonville, FL, Michael P. Coury, Humphreys, Dunlap, Wellford, Acuff & Stanton, Memphis, TN, for First Union Nat. Bank of Florida.

Julie C. Chinn, Asst. U.S. Trustee, Memphis, TN.

## MEMORANDUM OPINION ON COMPLAINT TO REVOKE ORDER OF CONFIRMATION AND ON MOTION TO CONVERT OR DISMISS CASE

WILLIAM H. BROWN, Bankruptcy Judge.

The plaintiff, First Union National Bank of Florida ("First Union"), as trustee of Florida Housing Finance Agency Multi–Family Guaranteed Mortgage Revenue Bonds, 1989 Series H (the "bonds"), for the apartment property known as Lakeside North at Altamonte Mall ("Lakeside"), filed this postconfirmation adversary proceeding against the debtor and former debtor in possession, Tenn–Fla Partners ("Tenn–Fla" or "debtor"). The complaint seeks to revoke the order confirming the debtor's chapter 11 plan and to obtain damages for alleged breaches of fiduciary duty by the debtor or its general partners. The complaint was filed on March 3, 1994. Subsequently, First Union, with permission of the court, amended its complaint to allege a count of constructive trust and to seek punitive damages. Prior to the trial on the merits, conducted on May 10–12, 1994, the court held hearings on First Union's motion seeking a temporary restraining order and a preliminary injunction, and injunctive relief was granted, pending the trial and determination of the merits of this proceeding. By order dated March 17, 1994, the debtor, its agents or persons acting in concert with the debtor were enjoined from taking further action to consummate the confirmed plan. See March 17, 1994 Order. At the conclusion of the preliminary injunction hearing, the court ordered that all proof submitted in the preliminary hearings would be a part of the record for trial on the merits. FED.R.CIV.P. 65(a)(2).

Subsequent to the entry of the injunctive relief, by consent of the relevant parties, the court permitted the debtor to proceed with a sale of the debtor's major asset, the Lakeside apartment complex (the "project" or "property") and the related bonds to United Dominion Realty Trust, Inc. ("United Dominion") for a total purchase price of $12,443,547. See Order dated April 1, 1994. Under that consensual order, only the normal closing expenses required to be paid by the seller were authorized; further, the debtor was authorized to use those funds necessary to satisfy the claims of classes 4, 5, 6 and 7 under the confirmed plan. The court had determined that these classes acquired the rights specified in the debtor's confirmed plan and relied in good faith on the confirmation order. See April 1, 1994 Order; 11 U.S.C. § 1144(1). All sale proceeds in excess of those authorized items were ordered to be held in an interest bearing escrow account pending further orders of this court, with the asserted claims, liens and interests of the bondholders as secured creditors and of the debtor to be transferred and to be attached to the escrowed funds. This sale has now closed and the Lakeside property and the bonds have

been conveyed to United Dominion. The court has also determined that the portion of the escrowed funds required to satisfy the allowed administrative claims of the bondholders and the $9,300,000 promised to the bondholders in class 3 of the confirmed plan should be paid. *See* Order dated July 19, 1994. As a result, the funds remaining in escrow are the subject of this opinion.

## ISSUES PRESENTED IN THIS ADVERSARY PROCEEDING

First Union has brought this complaint against the debtor seeking revocation of the order of confirmation of the debtor's plan that was confirmed consensually on January 14, 1994, and by an order entered on January 21, 1994; damages for breach of fiduciary duty by the debtor or its partners; and imposition of a lien or constructive trust on the excess proceeds from the sale of the Lakeside property. At the heart of the complaint is the allegation that the debtor obtained the order of confirmation by fraud in violation of 11 U.S.C. § 1144. That section provides:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall—
>
> (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
>
> (2) revoke the discharge of the debtor.

11 U.S.C. § 1144.

Also pending before the court and consolidated for hearing with this adversary proceeding is First Union's motion under 11 U.S.C. § 1112(b) seeking to dismiss this case or convert it to one under chapter 7.

These are core proceedings. 28 U.S.C. § 157(b)(2)(A), (L) and (O). This opinion contains findings of fact and conclusions of law pursuant to FED.R.BANKR.P. 7052.

## HISTORY OF CHAPTER 11 CASE BEFORE THIS ADVERSARY PROCEEDING

The debtor's amended disclosure statement filed in this chapter 11 case on February 19, 1993, reveals that the debtor acquired the Lakeside apartment property in 1984 for a purchase price of $5,019,960.48 in cash and assumption of $12,700,000 in debt. In February, 1989, the debtor reorganized and in November of that year the debtor refinanced the first mortgage on the property through tax exempt bond financing issued by Florida Housing Finance Agency. First Union became the bond trustee for the holders of the publicly traded bonds ("bondholders"). The refunding bonds were in the amount of $12,685,000. Mutual Benefit Life Insurance Company of New Jersey ("MuBen") guaranteed the first mortgage bond indebtedness and took a second mortgage position. The prior owner received a third mortgage. The second and third mortgages were wrap mortgages securing the same debt that was secured by the bondholders' first mortgage.

MuBen was forced into rehabilitation in the state Superior Court in New Jersey, where MuBen filed a plan of rehabilitation, under which no payment was proposed on its guarantee related to this case. Under the debtor's plan as confirmed, MuBen was the class 4 creditor to receive no distribution under the plan. However, upon acceptance of the debtor's plan, MuBen received a release of its guarantee and other liabilities to the debtor or as to the Lakeside mortgage. The prior owner, the class 5 creditor under the debtor's plan, was to receive no distribution as an unsecured creditor and its mortgage lien was released.

Sunburst Bank of Grenada, Mississippi was a fourth mortgage holder and was treated under class 6 as an unsecured creditor. However, in the consensual plan Sunburst received $10,000 in full release of its claims and lien.

The administrative claims in class 1 of the debtor's plan were to be paid in full, after allowance and approval by the court, and no tax claims existed in class 2. The unsecured trade creditors in class 7 were to be paid one

hundred percent of their relatively small claims.

The proof at this trial established that the general partners of the debtor had personally borrowed approximately $2,500,000 from First Tennessee Bank in Memphis for contributions that the partners had made to the operational expenses of the debtor. The debtor's amended disclosure statement asserts that the partners had contributed and invested in excess of $8,600,000 in the Lakeside project.

The debtor's amended disclosure statement further reveals that the debtor filed a voluntary chapter 11 petition after experiencing a general economic downturn in the Orlando, Florida real estate and apartment market, resulting in a decline of both apartment rents and the value of the property. In addition, the property had experienced damage from flooding, severe storms, road construction, plumbing leaks and poor management. Prior to filing its chapter 11 petition on July 17, 1992, the debtor had replaced its property management company, and throughout the chapter 11 case the apartment property was managed by Coleman Management Company and Ghertner Properties, Inc. In fact, the debtor authorized Mr. Harry Ray Coleman, Jr. to act on behalf of the partnership, including in such things as signing the petition, disclosure statements and plans.

Prior to confirmation, the court, after a contested valuation hearing, determined the value of the property to be $9,100,000. *See* Order entered April 23, 1993. The debtor appealed from this court's valuation; however, that value became irrelevant at the confirmation hearing on January 14, 1994, where the debtor, after negotiations between the debtor, First Union and one interested purchaser present at the confirmation hearing, agreed to pay more than the $9,100,000 to purchase the bonds and to effectively repurchase the property. Prior to its second plan, the debtor had offered a plan that would pay $8,500,000 to the bondholders, a plan that was unacceptable to First Union, which acted throughout this case on behalf of the bondholders.

That original plan, filed on December 16, 1992, offered the bondholders the alternative of allowing the debtor to secure a new $6,000,000 first mortgage, to pay that to the bondholders and to allow the debtor to operate the property for up to ten years with any sale during that term to require approval of the bond trustee. From such a sale the new mortgage would be paid but then the debtor proposed to receive the next $1,500,000 and the balance, if any, would then go to the bondholders. Not surprisingly, this alternative also was not acceptable to the bond trustee. The debtor's second plan, filed on October 20, 1993, proposed to pay the bondholders $9,200,000. This was modified again prior to and at confirmation to pay the bondholders $9,300,000 plus an allowed administrative claim for their attorney fees and expenses, which were related in part to the court's April 29, 1993, order on First Union's motion filed pursuant to FED.R.BANKR.P. 3017(e).

As a part of that order, the court found that the beneficial bondholders were the real secured creditors, for whom First Union acted as bond trustee. That order structured a procedure for voting and for § 1111(b) election by the bondholder class. On August 31, 1993, the bondholders filed a notice of election to have their claim treated as fully secured under the debtor's plan, pursuant to 11 U.S.C. § 1111(b)(2).

First Union successfully opposed an extension of the debtor's exclusivity period and filed its competing plan. *See* Order entered July 22, 1993. First Union engaged Emax Advisers, Inc. ("Emax") as a financial adviser and Emax sought solicitations from interested bidders on the apartment property or the bonds. After the Emax bid process, First Union filed a proposed agreement with Apollo Real Estate Fund, L.P./The Related Companies, L.P. ("Apollo") as a basis for its filing a competing plan. The debtor objected to First Union's effort, but that objection was overruled and First Union proceeded with its competing plan effort.

On August 16, 1993, First Union filed its original disclosure statement and plan based on a sale of the property and the bonds to Apollo. Under this plan the bondholders

would receive $8,200,000 in cash and a subordinated debt for a portion of the remaining claim. The Apollo agreement with First Union gave First Union the right to withdraw its plan at any time that First Union believed that the Apollo transaction was not in the best interest of the bondholders.

On September 13, 1993, Howe, Solomon & Hall, Inc. ("Hall"), a bondholder, submitted an offer to First Union to purchase the property and bonds for $9,100,000. After the Hall offer, First Union amended its plan and disclosure statement to provide for a sale to either Apollo or Hall. The Hall agreement with First Union also gave First Union the right to withdraw from the agreement if First Union determined that the Hall offer was not in the best interest of the bondholders. A bidding competition developed and Apollo matched the Hall offer.

Pursuant to the court's November 24, 1993 order, the debtor's amended plan and disclosure statement and First Union's competing amended plan and disclosure statement were mailed to creditors, including the bondholders. Accompanying these documents were solicitation letters to the bondholders from First Union and the debtor. First Union's letter advised the bondholders to vote for both plans, with an obvious strategy of encouraging further competitive bidding before or at confirmation. Exhibit 5 to complaint. The bondholders did accept both plans.

On the day of the confirmation hearing, the court permitted extensive negotiations between the interested parties to occur outside of the presence of the court. At the beginning of that day, the court allowed First Union's motion for $350,000 in fees and expenses as an administrative expense. The negotiations were between First Union, the debtor and Hall, Apollo having withdrawn from the bidding. The debtor increased its monetary offer to match the Hall offer, and the debtor and Hall then agreed that a nominee of the debtor would purchase Hall's bonds at a premium above the pro-rata distribution that would be paid to other bondholders under the debtor's confirmed plan. As a result, Hall withdrew its objection to the debtor's plan. The debtor's offer became the only viable bid. First Union then recommended confirmation of the debtor's plan and withdrew its objection. After an offer of proof on the necessary elements of 11 U.S.C. § 1129(a), the court orally confirmed the debtor's amended plan, and a confirmation order that incorporated the debtor's second amended plan and its modifications was entered on January 21, 1994. There was no appeal from the confirmation order.

The confirmed plan included this provision: "By voting to accept the Plan, the Bondholders waive their right to bid for ownership of the Project or fully secured status pursuant to Sections 1111(b) and 363(k) of the Bankruptcy Code." Debtor's Confirmed Plan at page 10. The debtor's confirmed plan placed the former equity holders (partners) in class 9 and provided that no plan distribution would be made to equity interest holders but that they would retain their interests in the project. Further, the legal existence and status of the general partnership debtor would not be affected by confirmation of the plan. The debtor's disclosure for that plan made the same representations.

## DISCUSSION AND FINDINGS OF FACTS RELEVANT TO THIS ADVERSARY PROCEEDING

It was after confirmation became final that the controversy presented in this adversary proceeding developed. Upon consummation, with an effective date of the plan being forty-five days after entry of the confirmation order, the amounts due to the bondholder class were to be paid. Prior to consummation, the debtor entered into a contract with United Dominion for the sale of the property and bonds for an aggregate purchase price of $12,443,547, resulting in an apparent net recovery to the debtor of approximately $2,500,000 over the amounts necessary to pay the bondholders and other creditors under the plan. This contract, Exhibit 7 to the complaint, is dated February 2, 1994. The debtor then revealed this contract to First Union, and the parties consensually engaged in extensive discovery both before and after First Union filed its complaint.

In its original disclosure statement, filed October 6, 1992, the debtor made a reference to an expression of interest it had received

from an unrelated third party to purchase the property for approximately $8,100,000, and that disclosure statement, as amended on February 18, 1993, said that the interested party included "a number of unsatisfactory contingencies" and never actually made an offer. Amended Disclosure Statement, pp. 7–8. Moreover, the debtor stated that it had "no indication that the interest was genuine." *Id.* p. 8. In that same amended disclosure statement the debtor placed a "quick sale" liquidation value on the property at $6,000,000, with a fair market value of $8,500,000. The debtor's property manager, Mr. Coleman, testified in an evidentiary deposition that this interest was communicated by telephone and that he could not recall who the interested party was. Coleman February 23, 1994 deposition, pp. 24–25. Mr. Coleman also said that he was advised during the bankruptcy to "disclose everything to everyone at all times." *Id.,* p. 25.

The evidentiary deposition of Robert Smith, the broker who ultimately produced the successful offer from United Dominion, reveals that the first interested party was FRM Properties, Inc. and that Mr. Smith procured and communicated this interest to Mr. Coleman by a letter from Mr. Smith dated September 10, 1992. Exhibit 3 to Smith deposition. Mr. Smith's notations and records concerning his recent involvement with the debtor's property were very comprehensive. Mr. Smith's testimony was that he discussed FRM's offer with Mr. Coleman on September 10, 1992 and that Mr. Coleman said that an $8,000,000 offer would be sent back with a note that Mr. Coleman needed at least $10,500,000. Smith deposition, p. 43 and its exhibit 1.

Mr. Smith further testified that when he talked again on September 14, 1992 with Mr. Coleman about the FRM offer, Mr. Coleman said that "his attorney about had a fit when he heard they got an offer." Smith deposition, pp. 45–46. Coupled with Mr. Coleman's testimony that he was advised by counsel that such an offer would have to be disclosed, a reasonable inference may be drawn that the debtor knew that it would have to disclose any future offers for the purchase of

the property. *See* Coleman February 23, 1994 deposition, p. 25.

Taken together with the other proof presented in this proceeding, there is also a reasonable inference that the debtor determined that it would not solicit or accept any offers for the purchase or sale of the property until after confirmation of a plan under which the debtor would retain ownership of the property. This inference is consistent with the obvious strategy employed by the debtor in its chapter 11 effort. As seen in the testimony of Bryson Randolph, a consultant to the debtor prior to its filing for bankruptcy relief, the debtor's strategy was to pay the bondholders cash at a minimum level as quickly as possible and to create an investment recovery for the debtor and its partners. Trial transcript, p. 349; Trial exhibit 38, tab 1 at pp. 10–11.

Mr. Coleman's agreement with the debtor provided for a real estate commission to Mr. Coleman in the event of a sale of the property. Trial exhibit 29. In the September 14, 1992 conversation with Mr. Smith, Mr. Coleman also told Mr. Smith that neither of them could realize a real estate commission out of a sale during the bankruptcy, as the bankruptcy court would not "pay" a commission. Smith deposition, p. 46. This was obviously an incorrect conclusion and statement, as bankruptcy courts frequently approve commissions for professionals who have been employed properly and who benefit the bankruptcy estate by production of sales. *See* 11 U.S.C. § 330. Nevertheless, Mr. Coleman's statement indicates a higher concern for his own benefit than for the benefit of creditors or of the bankruptcy estate. Mr. Coleman further told Mr. Smith not to place further offers on the property until it was out of bankruptcy. Smith deposition, p. 46 and its exhibit 1. Moreover, Mr. Coleman wrote a "personal and confidential" letter to Mr. Smith on October 10, 1992, saying:

I hope you understand that we cannot market the property while in bankruptcy.

When we get out of bankruptcy and the property is suitable for marketing, I have recommended to the partners that we use

your firm. At that time, your main buyer should be first in line to make a valid offer. Smith deposition exhibit 3.

As will be seen in the conclusions of law, the debtor's decision not to market the property while in bankruptcy was inconsistent with its fiduciary and debtor in possession obligations.

At trial the debtor took the position that it received no formal offers to buy the property prior to confirmation. However, the court finds that the debtor deliberately put off the receipt of actual offers until after the confirmation of its plan. The debtor knew that it would have to disclose any actual offers and, as argued by First Union, the debtor knowingly and deliberately postponed cultivation of offers and "parked" real interest in the property until after the confirmation hearing and order.

To place the debtor's actions in context, it must be noted that this entire chapter 11 case involved extensive litigation between First Union and the debtor. The debtor was certainly aware of First Union's position that it intended to realize as much recovery as possible for the bondholders from the property. Yet, the debtor failed to disclose to First Union, other creditors, or the court that the debtor was engaged in discussions with any interested purchasers, including United Dominion. United Dominion's representative, Mr. Scott, had one meeting with First Union's counsel, Mr. Woodrich, and with Ms. Donna Fay of First Union on or about September 7, 1993, but Mr. Scott did not advise First Union that United Dominion had been in contact with the debtor. Trial transcript, pp. 71, 443. United Dominion did not communicate any offer to First Union. *Id.*, p. 441. At that point First Union had already filed its competing plan, and First Union's representatives advised Mr. Scott that United Dominion could contact the debtor concerning any offers but also that United Dominion could bid on the property to First Union or that it could go directly to the bankruptcy court with a bid. Trial transcript, pp. 76, 446. After the one meeting with First Union's representatives, United Dominion did not contact First Union again. *Id.*, p. 446.

Mr. Gerald Smith of Smith Equities Corporation, the same company for which Robert Smith acted as a broker, testified that he met with Ms. Fay and Mr. Woodrich of First Union in June of 1993. At that time he had a potential purchaser in mind and he discussed the possibility of paying cash for the bonds with some money to the equity holder (debtor). First Union's response was that it was not interested unless an offer was above the $9,100,000 value fixed at the time by this court. Trial transcript, pp. 383–384. In December 1993 Gerald Smith contacted Ms. Fay again to determine the status of the bankruptcy. He testified that by that time the market had substantially improved for this property but he did not recall specifically discussing that with Ms. Fay. *Id.*, pp. 387–388. It was clear to Mr. Smith that Ms. Fay's interest was in getting the highest possible price for the property. *Id.*, p. 391. Mr. Gerald Smith testified that had he been told by the debtor in September 1993 that the property was for sale he would have pursued negotiations for the purchase of the property. Trial transcript, p. 449.

The debtor claims that it first talked with United Dominion only about possible financing, but United Dominion's interest was in purchasing the property. United Dominion's discussion of loans was premised upon it having an option to purchase the property. Smith deposition, p. 101; Scott deposition, p. 52; Trial exhibit 27. One of the debtor's letters to United Dominion on October 15, 1993 proposed an equity participation in which the debtor would sell United Dominion one half interest in the partnership for $9,200,000. Norbom deposition, pp. 73–74 and its exhibit 19. This in itself establishes that the debtor had a much higher opinion of the value of the property than what the debtor was offering to the bondholders in its plan. It also contradicts the debtor's argument that it had no special knowledge of the value of the property. The debtor was privy to opinions of value that were not shared with creditors or the court.

For example, prior to the bankruptcy filing and as early as December 17, 1991 Robert Smith, the broker, was writing to the debtor's representative with a valuation analysis

of $11,784,205. Again, on March 27, 1992 Mr. Smith wrote suggesting a sales price of $13,188,517 based upon estimated 1992 net operating income. Smith deposition exhibit 3. The court understands that the value went down as seen in the court's subsequent valuation. But, it obviously went back up and the debtor was aware of the appreciation.

United Dominion was represented principally by Benjamin Norbom in its preconfirmation discussions with the debtor's representatives. Robert Smith had introduced the property to Mr. Norbom in the fall of 1993, and Mr. Norbom had talks with Mr. Coleman, Mr. Stephen Rudolph, an accountant and adviser to the debtor, and Dr. David Meyer, the debtor's managing general partner. Norbom deposition, pp. 20–23. After confirmation, Mr. Norbom prepared an internal memorandum that stated that United Dominion and the debtor had "continual" discussions between August 1993 and October 1993 concerning United Dominion's interest in the property. Norbom deposition exhibit 21. Further, the memorandum states:

It was finally decided that the only alternative to purchase the property would be if the debtors [sic] plan was confirmed by the Court. It was also determined that United Dominion could not participate in the plan since the debtor's goal was to receive approximately two million dollars in excess of the discounted face value of the bonds. The bond trustee would seek the two million dollars for the benefit of the bond holders, which was the reason United Dominion could not participate. *Id.*

The reasonable inference is that Mr. Norbom gained this understanding of the debtor's strategy from Mr. Coleman, with whom he was in "continual" contact. Mr. Norbom's understanding is consistent with the prebankruptcy strategy advice given to the debtor by Mr. Randolph and with the debtor's actions undertaken to carry out that strategy in the bankruptcy case. It does not escape the court's attention that the debtor's partners had a personal obligation to First Tennessee Bank, which was not a creditor in this bankruptcy case, for approximately $2,500,000, and that Mr. Norbom's memoran-

dum and the ultimate purchase price paid by United Dominion are consistent with the debtor's goal of netting that amount after confirmation. As noted in the prior section of this opinion, the debtor's disclosure and plan provided that no plan distribution would be made to the partners. The effect of the debtor's action would be to distribute approximately $2,500,000 to the partners. Thus, the debtor was misrepresenting its intentions in its disclosure and plan.

As stated previously, the debtor did not disclose any of its negotiations with United Dominion to any creditors or parties in interest, including First Union, nor did the debtor disclose this to the court prior to confirmation. Certainly, the debtor's negotiations with United Dominion were more extensive than its contact from FRM, which the debtor did disclose but downplay. If the debtor realized that the FRM interest was a material fact, why then did the debtor not realize that the United Dominion negotiations were material? The court's conclusion is that FRM was disclosed because it served the debtor's purpose of holding down the value of the property, but disclosure of the extent of United Dominion's interest in purchasing the property was contrary to the debtor's goal of retention of the property after paying the bondholders a discounted value. It is significant that but for the debtor's refusal to negotiate a purchase contract, United Dominion was ready to and capable of negotiating a purchase agreement. Trial transcript, pp. 448–449.

The debtor's failure to disclose United Dominion's interest is given a heightened significance in view of the § 1111(b)(2) election in this case. Pursuant to that section, the bondholders had made an election to retain their first mortgage lien position up to the full face value of the bonds. The debtor's representative, Mr. Coleman, testified that he understood this election to mean that if the property were sold prior to confirmation or pursuant to First Union's plan, the bondholders would receive all sale proceeds up to the full amount of their claim. Trial transcript, p. 295; March 14, 1994 transcript, p. 155. The debtor opposed the bondholders' election and wrote them a letter to that

effect. Trial transcript, p. 309. With the election, which was reported to the court on August 31, 1993, the debtor knew that it could be cut off from any recovery from the property. The effect of this election on the debtor's strategy was for the debtor to seek confirmation of its plan that contained a provision that its acceptance would vitiate the § 1111(b)(2) election for accepting bondholders. Moreover, the reasonable inference from all of the proof is that the debtor knew that disclosure of the true level of preconfirmation interest in purchase of the property would undermine acceptance of the debtor's plan and would encourage a sale of the property for the benefit of the bondholders rather than for the benefit of the debtor or its partners.

This inference is enhanced by the realization that the debtor had preconfirmation contacts with interested purchasers other than United Dominion. These contacts were occurring around the same time that the debtor was filing a new disclosure on November 9, 1993, which represented that the liquidation value of the property was less than $9,100,000. The debtor was aware that a sale of the property would produce significantly more. On or about November 3, 1993, Mr. Jack Friedman, another real estate broker, showed the property to Paul Earle, a vice president for acquisitions for Colonial Properties, a Birmingham based real estate investment trust. Earle deposition, p. 9; Friedman deposition, pp. 16–18. Mr. Earle considered the property to be a "great acquisition for Colonial Properties." Earle deposition, pp. 11–12 and its exhibit 1. Later that day, Mr. Friedman met with Mr. Coleman on the property site and discussed Colonial's interest and ability. Mr. Coleman inquired what price Colonial would be willing to pay and Mr. Friedman suggested a capitalization rate of 9%. Mr. Coleman stated that such a rate would produce too low a price. Friedman deposition, p. 18. Mr. Coleman told Mr. Friedman that he believed there were "lots of other buyers who would pay more." Friedman deposition, p. 19. The proof established that on income producing property such as this, the capitalization rate is an important factor in arriving at a market price or value. For example, Mr. Cole Whitaker,

another broker, testified that when capitalization rates go down, the value of the property goes up. Whitaker deposition, p. 14; *see also* Friedman deposition, p. 24.

Mr. Coleman stated to Mr. Friedman that it would be sixty days before the debtor could consider any offers. Friedman deposition, p. 19. Mr. Friedman requested that Colonial be given a first chance to bid on the property and indicated that he would be back in contact with Mr. Coleman in early December 1993 to see if a sale could be pursued. Friedman deposition exhibit 3. Mr. Earle, of Colonial Properties, also had a telephone conversation with Mr. Coleman within a short time after his November visit to the property, and Mr. Coleman said that the property was in bankruptcy and not available for sale. Mr. Earle explained the high interest of Colonial in pursuing acquisition. Earle deposition, p. 13. Mr. Coleman started talking with Mr. Earle about other properties for sale. *Id.*, p. 14. Over the course of the next two months, Mr. Earle would call Mr. Coleman for an update of the status of the property and was told that as soon as the property was cleared from bankruptcy he would be notified. *Id.*, p. 16. The interest of Colonial was of an equal or greater level than that of FRM; yet, the debtor did not disclose this interest to creditors, parties in interest or the court. Colonial's interest was so high that it made an offer on or about February 4, 1994, after an earlier face to face meeting with Dr. Meyer and Mr. Coleman. That offer was for $12,250,000, and Dr. Meyer changed the price to $12,300,000. Earle deposition, pp. 26–27 and its exhibit 4. Colonial did not accept this counteroffer. Earle deposition, p. 29. The debtor stresses that Mr. Earle stated that he personally would not have been interested in purchasing the property out of bankruptcy; otherwise, Colonial would have pursued a letter of intent earlier. *Id.*, p. 31. However, Mr. Earle had never asked Colonial's board if it would be interested in pursuing purchase of this property through a bankruptcy process. *Id.*, p. 33. Moreover, Mr. Earle's personal view of purchasing through bankruptcy is not significant to the outcome of this proceeding. As First Union argued, had it known of Colonial's

interest, First Union could have sought denial of any confirmation, relief from the stay or dismissal of the case, all with a goal of negotiating a postbankruptcy sale to Colonial. The crucial point is that, like United Dominion, Colonial Properties was very interested in purchasing this property. In addition to failing to disclose Colonial's interest to First Union or to the court, Mr. Coleman did not reveal First Union to Mr. Friedman; thus, Mr. Coleman precluded any opportunity for First Union to pursue negotiations with Mr. Friedman or Mr. Earle. Friedman deposition, p. 12.

As another indication of the debtor's awareness of the property's true value, Mr. Coleman discussed a possible loan on the property in the third quarter of 1993 with Christopher Heinberg of Metmor Financial, Inc. Heinberg deposition, pp. 12, 15. To finance the property out of bankruptcy and to recapture monies put into the project by the principals, a number in excess of $12,000,000 was discussed. *Id.*, p. 16. Metmor was considering a loan in the $7,500,000 range. *Id.* and its exhibit 1. The loan process was delayed pending the debtor's emergence from bankruptcy, and Mr. Heinberg had been advised of the January confirmation hearing date by Mr. Coleman. Heinberg deposition, p. 32. Meanwhile, Mr. Coleman called Mr. Heinberg to relate that buyers were pursuing him. *Id.*, p. 31.

This was obviously correct. The debtor, through Mr. Coleman, had contact with another interested buyer in the fall and winter of 1993 through Cole Whitaker, a broker. Mogentale deposition, p. 6. Mr. Whitaker had contacted Mr. Coleman in the fourth quarter of 1993 and was told to get back in touch in January. Whitaker deposition, p. 18. Mr. Coleman did not mention First Union to Mr. Whitaker. *Id.*, p. 19. Through Mr. Whitaker, JMB Institutional Realty Corporation of Chicago sought an exclusive right to purchase the property. Mogentale deposition, p. 15. The court can not accept an argument that this level of interest was immaterial to the disclosure and plan process in the context of the facts present in this case. For example, in December 1993 Mr. Mogentale of JMB spoke with Mr. Coleman, who advised that the property was in bankruptcy and that Mr. Coleman could not accept any offers until after acceptance of the debtor's plan. Mr. Mogentale told Mr. Coleman that JMB was interested in purchasing the property and he discussed the property's value with Mr. Coleman. At that point, Mr. Coleman stated that JMB could get the property if it would pay in the mid–$11,000,000 range, and Mr. Mogentale indicated an interest in that range. Mr. Coleman advised that the debtor might be able to deal with JMB on the property in mid-January 1994. *Id.*, pp. 10–12. As with other prospective purchasers, JMB's interest was not disclosed by the debtor. Nor did the debtor advise Mr. Mogentale of the bond trustee; thus, JMB was discouraged from contacting the bondholders to attempt to purchase the mortgage obligation. *Id.*, p. 32. Moreover, the debtor did not disclose this additional real indicator of an increased market value.

On January 7, 1994 Mr. Mogentale transmitted a letter to JMB's broker, to Mr. Rudolph, to Mr. Coleman, and to Dr. Meyer, advising that JMB was interested in "forwarding a purchase offer" for the property. Mogentale deposition exhibit 2. That letter also stated that Mr. Coleman had advised Mr. Mogentale in the last quarter of 1993 of the status of the bankruptcy case. Mr. Mogentale offered to meet with the debtor immediately after January 14, 1994 to negotiate the purchase of the property. *Id.* And, Mr. Mogentale testified that the only reason for delay in making an offer was Mr. Coleman's refusal to negotiate until after confirmation. Mogentale deposition, p. 34 and its exhibit 2. After receipt of this letter, Mr. Coleman called Mr. Mogentale to tell him not to make further direct contact with Dr. Meyer and that the earliest the debtor could meet with JMB to discuss a purchase would be ten days after the confirmation hearing. Mogentale deposition, pp. 17–18. At that point, JMB's interest was sufficient to contemplate an offer in the $11,500,000 range. *Id.*, p. 14. JMB's interest is significant because it continued to just before the confirmation hearing; yet, the debtor did not amend its disclosure statement or otherwise disclose to creditors, interested parties or the court the level of interest in the property or the true value

of the property. JMB's level of interest was so high that it did communicate a desire to make an offer on January 26, 1994. Mogentale deposition exhibit 3. Mr. Mogentale had already received operating numbers and budgets on the subject property from Mr. Coleman. Mogentale deposition, pp. 23–24; its exhibits 1 and 5. On February 1, 1994 after a meeting in Memphis with Dr. Meyer, Ray Coleman, and Stephen Rudolph, Mr. Mogentale communicated a written offer after being told by Dr. Meyer that its bid would have to be in the $12,400,000 to $12,600,000 range in order to satisfy the liabilities and expectations of the partners. Mogentale deposition, pp. 27–28. JMB's offer was for a purchase at $11,700,000. Mogentale deposition exhibit 4. It is interesting to observe that Mr. Mogentale's February 1, 1994 letter addressed to Dr. Meyer and Mr. Rudolph states: "You have certainly made clear your sincere intentions on selling the Property, [and] the price you expect to receive for the property...." Mogentale deposition exhibit 4.

The debtor now says that it had not concealed its intentions concerning the property, but the proof compels a contrary finding. As noted previously, the debtor's original disclosure statement and plan provided for a cash payment to the bondholders that was less than the recovery to the bondholders under the two contracts First Union had obtained from Apollo and Hall. In October 1993 the debtor amended its plan to mirror the plan proposed by First Union. In that amended plan, the debtor proposed to sell the property and the bonds to a nominee of the debtor. Then, the debtor again modified its plan to provide for retention of the property by the debtor and purchase of the bonds by the debtor's nominee. The debtor's actions and its November 15, 1993 plan solicitation letter to the bondholders would cause the bondholders and First Union to infer that the debtor intended to retain the property. Exhibit 4 to complaint. That letter specifically stressed the debtor's expenditure of funds to obtain and close on new financing. The letter also criticized the Hall and Apollo offers as being laden with contingencies and urged rejection of these offers. The letter represented that absent acceptance of the debtor's plan, there would be "a possibility" that the bondholders "could be left without a buyer." *Id.* In the face of the debtor's knowledge, this was at best a representation made in reckless disregard for its truthfulness. The letter was signed by Mr. Coleman as project manager for the debtor.

In view of this letter, it would certainly be of material interest to the bondholders to know that the debtor was engaged in discussions with interested purchasers and had "parked" any further negotiations until after confirmation of the debtor's plan. The best test of materiality of these facts would be the simple questions: Would disclosure of that information have made any difference to creditors in voting to accept the debtor's plan or in choosing to prefer the debtor's plan over First Union's plan, and would disclosure of that information have affected the court in its confirmation decision? First Union of course now says that the information would have made a difference in its advice to the bondholders. The court believes that knowledge of the true level of interest in purchase of the property would have altered the outcome of the confirmation.

Also, as argued by First Union, the debtor, as owner of the property, was in the best position to know the actual market value of this property. This is certainly true of this debtor that was secretly exploring the market. Value was certainly of interest to the parties in their negotiations prior to and on the day of confirmation. Yet, the debtor suppressed facts within its knowledge that would have influenced the negotiations over confirmation. Mr. Coleman testified that he did not pursue sales prior to confirmation because the debtor did not have control of the property. This not only ignores the real issue, it simply is not true. The debtor in possession was still the owner of the property prior to confirmation and had control over offers to purchase or interests in purchasing that were communicated only to the debtor or its representatives. Moreover, the debtor in possession had a trustee equivalency and fiduciary duty to creditors and to the court that will be discussed more fully later.

The debtor's amended plan, until the date of the confirmation hearing, proposed a cash

purchase of the bonds for $9,200,000. Although it is a conclusion of law, the court will note here that after the § 1111(b)(2) election the debtor's plan was legally incapable of confirmation under either § 1129(a) or (b), absent acceptance by creditors. As previously noted, the debtor's plan provided that its acceptance would vitiate the § 1111(b)(2) election by those bondholders who accepted the plan. The debtor's November 15, 1993 solicitation letter to bondholders urged them to accept the debtor's plan and to reject First Union's plan. Exhibit 4 to complaint. Had this occurred, with confirmation of that plan the debtor would have achieved a cash out of the bondholders at $9,200,000. At this point, the debtor knew with reasonable certainty that it had purchasers waiting to pay the debtor approximately $2,000,000 more.

The bondholders accepted both the debtor's and First Union's plans, and this set up the potential for a bidding competition on the day of confirmation. In part, the debtor relies upon its position that competitive bidding gave the bondholders their opportunity to realize true value. However, the bondholders were not aware of all of the facts, including that the debtor was bidding with a 100% chance of success. The debtor was bidding on the date of confirmation knowing the real interest in the marketplace, knowing the true market value of the property, and knowing that its maximum bid that day could be recovered with an instant "profit." The court can not say that the confirmation bidding was truly competitive or fair. As an example of the debtor's advantage, on the day of confirmation Mr. Robert Smith, the broker for United Dominion, was present. The debtor knew this and knew that he represented United Dominion; yet, this knowledge was not shared with First Union, the court, or anyone else. The debtor now says that it was concerned that Mr. Smith might bid at confirmation for United Dominion. Obviously, there was no such real fear because Mr. Coleman, who was also present at the confirmation hearing, had an understanding with Mr. Smith that they could begin to negotiate in earnest as soon as the confirmation became final, and that is exactly what occurred.

Also, on the day of confirmation, the only serious bidder present, other than the debtor, was Hall. As noted previously, Apollo, which had earlier made an offer of $9,500,000 as a part of First Union's plan, had decided that it would not attend the confirmation hearing because it had decided not to increase its bid. Neuman deposition, p. 11. As a result, First Union had little choice but to withdraw its plan and its objection to confirmation of the debtor's plan. In negotiations that day, the debtor agreed to purchase Hall's bonds at a premium, and this eliminated Hall as a competitor. A nominee of the debtor purchased Hall's bonds for approximately $2,000,000. Trial transcript, p. 238. Hall began to purchase some of the publicly traded bonds securing the mortgage on the debtor's property in May 1993. Hall deposition, p. 17. Mr. Christopher Hall was deposed by the debtor's counsel two days before the confirmation hearing. He confirmed that Hall had increased its bid to $9,500,000. Hall deposition, p. 24. And, he stated that Hall would probably resell the project if it was successful in acquiring it. *Id.*, p. 28. He expressed an opinion that the property was worth $10,800,000. *Id.*, p. 40. And, Mr. Hall expressed an opinion that the debtor had "been something substantially less than truthful to bond holders," and that Hall had picked up early in their involvement that the debtor "low balled every chance" it got. *Id.*, p. 44. His analysis of the operating figures provided by the debtor led him to believe that the debtor was attempting to make the project look as bad as possible, hoping to fragment the bondholders. *Id.* While the court is not bound by Mr. Hall's opinion, which was not shared with the court prior to confirmation, it is consistent with the proof presented in this proceeding and with the apparent strategy of the debtor in its confirmation process.

Notwithstanding Apollo's withdrawal from the bidding at confirmation, Aviva Neuman of Apollo called Dr. Meyer the day before the confirmation hearing to see if the debtor had an interest in being a joint venturer in the project. The response was that the debtor could not agree to anything until after confirmation and that the debtor was not interested in a joint venture because the partners

wanted to recover their money. Dr. Meyer talked of having a lot of money in the project. Neuman deposition, pp. 13–14. And, Ms. Neuman was told that if the debtor won the bidding at confirmation, it would be looking for purchasers to get its money out of the project. *Id.*, p. 14. Also, in that conversation Ms. Neuman and Dr. Meyer talked about Apollo getting an option on the property. *Id.* After the confirmation hearing, the debtor and Apollo entered into an option and first refusal agreement. Neuman deposition exhibit 1. That agreement, executed on behalf of the partnership by Dr. Meyer, is dated February 1, 1994, and it established an option price of $10,300,000 with the option exercisable only between June 1 and July 1, 1994. Further, the agreement gave Apollo the right of first refusal to meet any other contract received by the debtor. *Id.* On February 2, 1994 Stephen Rudolph for Tenn–Fla sent a letter by facsimile to Ms. Neuman revealing that the debtor had a contract for sale of the property to another entity for $12,443,547. Neuman deposition exhibit 4.

The debtor, of course, argues that no agreement had been made to sell the property until after the offer from United Dominion was received after the finality of the confirmation order. *See, e.g.,* testimony of John P. McCann, trial transcript, p. 428. That ignores the reality of what did occur—a secret "parking" of a virtually certain deal until after confirmation. The difficulty with the debtor's argument is that it is inconsistent with the proof and the reasonable inferences to be drawn from the facts, including many undisputed facts. In view of the specific postponement of interested buyers until after confirmation and the ease with which the debtor reached an agreement to sell, it is improbable that the debtor had no preconfirmation intention to sell the property. Dr. Meyer testified that he thought the debtor would have to retain the property for some time to recover its investment; however, the partnership would "sell it whenever the project would gain value." Trial transcript, p. 125. He knew that the Florida real estate market was recovering and that the debtor's plan could allow the partners to recover their losses and possibly some gain. *Id.*, p. 122. In fact, the convincing proof is that the debt-or intended to sell the property as soon as possible. Moreover, the proof established that the debtor's managing partner and Mr. Coleman knew with exactness what price was expected to satisfy the partners' personal liability to First Tennessee Bank, and the debtor knew that it could sell the property.

For example, on January 26, 1994 Dr. Meyer and Mr. McCann of United Dominion agreed to a $12,400,000 approximate figure. McCann deposition, p. 9. On January 17, 1994 Benjamin Norbom of United Dominion prepared a letter, which was not sent, proposing to purchase the property for $11,815,-000 cash. Norbom deposition, p. 29 and its exhibit 4. In September 1993 the debtor had prepared a conceptual proposal for a sale at $10,442,500, a price above the value being represented by the debtor at that time in its disclosure and plan. Norbom deposition exhibit 7. Around this time, the debtor was exploring an equity participation with and a loan from United Dominion. Under the equity participation proposal, United Dominion would advance $12,685,000 to purchase the bonds but would acquire only fifty percent ownership, with the debtor retaining fifty percent ownership for its "equity." Norbom deposition exhibit 19. Such a proposal is inconsistent with the debtor's representations of value to this court. Mr. Norbom's handwritten notes after the confirmation stated that United Dominion became aware of the property in August 1993 and had continuing discussions with the debtor "and their counsel to purchase or in one way or another gain control of the property." Norbom deposition exhibit 8. Those notes, which were quoted previously at page 13, close with the statement that "the debtor would prefer an immediate sale." *Id.* Mr. Norbom's deposition confirms that the debtor's bankruptcy counsel was involved in the discussions with United Dominion in August 1993. Norbom deposition exhibits 13 & 14. As early as October 14, 1993 Mr. Norbom advised Mr. Coleman that if the debtor was successful in the bankruptcy, United Dominion would still be interested in talking about a purchase. Norbom deposition, pp. 75–76. Mr. Norbom testified that real estate values had moved upward since the court's valuation

of this property. Norbom deposition, p. 85. Unfortunately, the court was never advised of the debtor's knowledge that the values had substantially improved above the $9,100,000 value fixed by the court prior to the confirmation.

Much is made by both sides concerning a Christmas 1993 telephone call from Mr. Norbom to Mr. Coleman. Both said it was a Merry Christmas call, but Mr. Norbom conceded that he may have been told in the call that the debtor's plan had been filed. Norbom deposition, pp. 90–91. The significance of the call is that contact between these individuals was continuing, and it is obvious that Mr. Coleman knew of United Dominion's continuing and serious interest in the property.

The debtor is a partnership and its intent can be found in the actions taken by its partners or authorized representatives. Dr. Meyer testified in his deposition that the primary debt he was concerned about was the one to First Tennessee Bank, which was over and above the partners' original lost investment. Meyer deposition, p. 45. The court is persuaded that Dr. Meyer was not fully aware of the ramifications of the chapter 11 process. For example, he did not read any of the plans submitted, either by the debtor or by First Union. *Id.*, p. 49; Trial transcript, pp. 102–103. He did not know how much the plans, including the debtor's, proposed to pay the bondholders. Meyer deposition, p. 50. Dr. Meyer's interest was to protect the partners and his goal was to "get that property or we lost everything." *Id.*, pp. 49, 61. Dr. Meyer was aware that Mr. Coleman was talking to people about the property and "that as soon as we were in the position and allowed to, that he [Mr. Coleman] would like me [Dr. Meyer] to meet some of those people." *Id.*, p. 59. Dr. Meyer was told by Mr. Rudolph and Mr. Coleman that he needed to wait until February to negotiate with interested buyers. *Id.*, p. 60. Dr. Meyer denied that he had engaged in any fraudulent or deceitful acts. *Id.*, pp. 101–102. The court is persuaded that Dr. Meyer was kept somewhat in the dark of all of the actions and the implications thereof taken by Mr. Coleman in regard to interest-ed purchasers. It is not necessary that Dr. Meyer or the partners expressed a specific intent to defraud. As stated previously, the actions of the partnership may provide a basis upon which fraudulent intent may be inferred. And, Dr. Meyer and the other partners had authorized Mr. Coleman to act on behalf of the partnership. *See* trial transcript, pp. 164–165. Dr. Meyer obviously enjoys a favorable world-wide reputation in his medical specialty. *See* trial exhibit 35. That reputation does not influence the outcome of this adversary proceeding because this proceeding does not concern Dr. Meyer's professional qualifications. Rather, the actions taken on behalf of the debtor partnership by Dr. Meyer and those actions taken by others but implicitly approved by him are the source of First Union's complaint.

In his testimony, Dr. Meyer denied that he offered to sell the property for $12,500,000 prior to the confirmation, but he advised Ms. Neuman of Apollo on January 13, 1994 that the debtor had that much in the property. Trial transcript, pp. 87–88. He also denied that he knew the property was worth that much and he pointed to his acceptance of Apollo's option to purchase the property for $10,300,000. *Id.*, p. 90. The court construes this option to have been a safety net for the debtor, a worst case scenario to protect its confirmation commitment. The debtor knew from its records maintained by Mr. Rudolph that its recovery expectancy was $12,484,-546.50, which amount included, of course, the First Tennessee note balance. Trial exhibit 36.

Dr. Meyer also did not appear to fully understand his fiduciary duty to the bondholders as creditors in the chapter 11. He stated that his responsibility was to do the best he could for the "project" rather than for creditors. Trial transcript, p. 157. He did not acknowledge that he had a duty to follow up on the JMB offer, for example, for the benefit of bondholders. *Id.*, p. 174. Like Mr. Coleman, Dr. Meyer appeared to be under the false impression that the debtor did not control the property until after confirmation. *Id.*, p. 177. He did not answer directly the critical question put forth by First Union's counsel: Whether the debtor

had a duty to disclose to creditors and to the court the fact that Mr. Coleman had been in touch with several prospective purchasers who would be pursued as soon as the debtor's plan was confirmed? *Id.,* pp. 184–185. The answer is obviously yes.

Stephen Rudolph, a certified public accountant and financial consultant for the debtor and the chief administrative officer of Dr. Meyer's Vitreoretinal Foundation Medical Clinic, denied that anyone had contacted him regarding purchase of the property prior to the filing of the debtor's disclosure statement or plan. Trial transcript, pp. 204–206. Prior to the filing of those documents, he had seen JMB's letter of interest. *Id.,* p. 206. As an indication of Mr. Rudolph's restrictive view of the debtor's duty to creditors, he acknowledged that he received JMB's letter but he considered it of no significance, and he did not respond to it. *Id.,* pp. 233–234. Yet, JMB made an offer after confirmation for $11,700,000. *Id.,* p. 235. He also denied any communication of offers to him prior to the debtor's amendments to its plan and he denied that the debtor had any agreement to sell the property to anyone prior to confirmation. *Id.,* p. 214. He understood that if such an offer had been made prior to confirmation, the benefit would have gone to bondholders and not to the partners. *Id.,* 236. Mr. Rudolph relied upon the prebankruptcy report and strategy input from Mr. Bryson Randolph. Trial exhibit 37. That strategy was to file chapter 11, purchase the bonds at a sharp discount and realize a "significant investment recovery potential for Tenn–Fla." *Id.,* p. 11. Mr. Rudolph knew the impact of the bondholders' § 1111(b) election on the debtor's strategy. Trial transcript, p. 222. He confirmed the debtor's goal of selling the property at some point to pay off the partners' debt and to maximize their return. *Id.,* 226.

Mr. Coleman also denied any commission of fraud. *Id.,* pp. 244–245. During his management of the debtor's property, he had improved the property and its performance. He admitted that the net operating income had improved on this property during the chapter 11 and that the market in Florida had improved, but he took the position that these improvements were common knowledge. *Id.,* p. 257. He tried to downplay the significance of the contacts he received from interested parties by stating that he frequently received broker contacts that did not materialize into offers. He stated that he advised such brokers during the bankruptcy about the bankruptcy process and that they could appear at confirmation and bid. *Id.,* p. 253. However, Mr. Coleman's error is best illustrated by his testimony that the debtor did not "own or control the property until" confirmation on January 14, 1994, and, thus, he could not do anything with the prospective purchasers. *Id.,* pp. 253, 279. As Mr. Coleman received contacts from interested parties, he was "pumping them" for information about the market. *Id.,* p. 271. This advantageous position concerning market knowledge is overlooked and downplayed by the debtor.

Mr. Coleman rationalized that all parties were going to take a "haircut" on this project. *Id.,* p. 259. However, Mr. Coleman had knowledge about the level of interest in the property that was not shared with First Union or the court. He had extensive contacts with brokers such as Robert Smith throughout the pending chapter 11. *Id.,* p. 278. In late June 1993 Mr. Coleman met with Mr. Smith, when Mr. Smith stated that United Dominion was interested in purchasing the property. Instead of pursuing that interest, Mr. Coleman relied upon the debtor's desire at that point to obtain a new loan. *Id.,* p. 282. Mr. Coleman again said that at that point the debtor did not control the property and therefore could not sell it. *Id.,* p. 284. He stated that the property was in bankruptcy at that point and that the debtor was "bidding on it just like other people were." *Id.* He understood that if an offer was received at that point no money would go to the partners. *Id.,* p. 285.

Significantly, Mr. Coleman did not dispute that JMB, Colonial and United Dominion were qualified buyers. He acknowledged that these were "very sophisticated buyers" but that he did not "have any desire to receive an offer. I didn't have control of the property." Trial transcript, pp. 293–294. In fact, immediately after confirmation, he instructed that offering packages be sent to

these three entities along with others. *Id.* p. 289. All three of these entities made post-confirmation offers in excess of what the debtor had just agreed to pay for the bonds at confirmation. *Id.* At this point in his testimony, Mr. Coleman actually said that he "had forty or fifty brokers that wanted first chance to bid on this property." *Id.*, p. 292.

Mr. Coleman, consistent with the misunderstanding held by Dr. Meyer and Mr. Rudolph, did not comprehend the trustee or fiduciary duty of the chapter 11 debtor in possession to maximize the return to creditors. For example, he would not directly answer the question of whether it was important for bondholders to know that he had met with Colonial's broker and had told the broker that he could not take an offer for sixty days. He responded that he did not know if this was important and that "[t]here were numerous buyers out there during that time." Trial transcript, pp. 296–297.

Bryson Randolph, who advised the debtor prior to and during the chapter 11 case, did not recommend that the debtor purchase the bonds and property at $9,300,000. Trial transcript, p. 334. This fact is negative for the debtor's position, as it indicates that the debtor had other knowledge, not held by Mr. Randolph, to justify the debtor's decision to bid that much at the confirmation. *See* trial transcript, p. 355. Mr. Randolph, who advised the debtor to file chapter 11, appeared to be acting in his good faith belief at that time that the property was worth approximately $6,000,000. *Id.*, p. 350. The debtor independently learned that this was a deflated value.

Mr. Randolph conceded that simply knowing the net operating income or examining the debtor's operating reports would be an insufficient basis for determination of whether the property was improving or declining in value. Trial transcript, p. 370. First Union raised questions about the accuracy of or reliability of operational financial information generated by the debtor and sent to First Union. *See* testimony of Bryson Randolph and of Kirk Michel. Mr. Michel of Emax was called in rebuttal by First Union, and he testified that the financial information provided to prospective purchasers immediately

after the confirmation rearranged the same financial information that had been presented to preconfirmation creditors so as to present it in a more positive light. He stated that the debtor had reclassified a number of expenses, which had been shown in preconfirmation reports as operation expenses, to now call them capital expenditures. Thus, those expenses were not deducted from gross income of the property and the net operating income increased by approximately $200,000. Trial transcript, pp. 468–470 and trial exhibit 39. Capitalization of this increased net income at a capitalization rate of seven to eight percent would increase substantially the value of the property. As First Union argues, it reasonably may be inferred that the debtor wished to present a more favorable image of the property's value to purchasers immediately after confirmation than the debtor was presenting to the bondholders prior to confirmation. Such an inference is consistent with the other proof indicating that the debtor concealed from the bondholders material knowledge of the level of interest in purchasing this property at a higher price than was being paid at confirmation.

The debtor argues that First Union had an opportunity and obligation to solicit bids on the property. The court does not agree that First Union had the same obligation placed upon the debtor in possession; nevertheless, First Union did engage Emax to evaluate the debtor's plan and to solicit bids. It was through that effort that Apollo and Hall made bids and that First Union's alternative plan was filed. *See* testimony of Kirk Michel. It is not helpful to the debtor to argue that First Union could and should have done more, when the logical inference from the proof before the court is that without First Union's plan, the debtor would have attempted to pay the bondholders even less than was called for in the confirmed plan. Instead of criticizing First Union or Emax for not inviting other prospective bidders to the confirmation, the debtor must answer why it did not advise the court that it knew of bidders who had been "parked" by the debtor and who were not encouraged by the debtor to bid at the confirmation hearing. Contrary to the impression given to the court on the day

of the confirmation hearing, a true and fair auction did not occur that day.

## SUMMARY OF FINDINGS OF FACT

The court has considered all of the proof, disputed and undisputed, and has weighed the interest and credibility of witnesses. From its discussion of the proof, it is evident to the court that the debtor provided misleading and incomplete disclosures, that the debtor had serious contacts with several motivated and qualified purchasers at prices far exceeding what the debtor was offering to the bondholders, that the effect of the debtor's actions was to misrepresent the market for and market value of the property, that the debtor intentionally discouraged the submission of offers prior to confirmation, that the debtor concealed or "parked" purchasers until after the confirmation, that the debtor was motivated to accomplish its goal of protecting the investment of its insider partners by assuring payment of their recourse First Tennessee Bank debt, and that the debtor misrepresented to the court at the confirmation hearing that it was in compliance with all elements of § 1129(a). In summary, the debtor violated its debtor in possession obligations and engaged in self-dealing to the expense of the bondholders, who had been induced by the debtor's misrepresentations to give up their § 1111(b)(2) election. All of this was accomplished by the debtor without adequate disclosure to the court or to creditors until after the confirmation hearing and order.

## CONCLUSIONS OF LAW:

### STANDARD OF PROOF

The first legal issue before the court is whether fraud may be established by a preponderance of the evidence standard or whether the plaintiff must satisfy a clear and convincing evidence standard.

It is First Union's position that the preponderance of evidence standard is applicable to the fraud allegations raised in this proceeding and that such application is consistent with the holdings of the United States Supreme Court in various cases involving fraud, including its holding in a discharge-

ability context in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The debtor contends that the seriousness of the fraud allegation here threatens important individual interests, namely the personal and professional reputations of the debtor's partners. Further, the debtor argues that revocation of the order of confirmation as a remedy that would upset a final judgment is so serious as to require that it be proven by clear and convincing evidence.

The annulment or reformation of "presumptively valid written instruments on account of fraud" arose in courts of equity where legal remedies were unavailable because of the Statute of Frauds, Statute of Wills, or the parole evidence rule. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 389, n. 27, 103 S.Ct. 683, 691, n. 27, 74 L.Ed.2d 548 (1983). Because of concern that claims of fraud would be fabricated, a higher standard of proof, clear and convincing, was imposed by these early courts of equity. *Id.* *See also* E. CLEARY, MCCORMICK ON EVIDENCE § 340 at 959–61 (3d ed. 1984). Thus, the common law doctrine of fraud developed "that when in a court of equity it is proposed to set aside, to annul or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt." *Herman v. Huddleston,* 459 U.S. at 389, 103 S.Ct. at 691 (quoting *Maxwell Land–Grant Case,* 121 U.S. 325, 381, 7 S.Ct. 1015, 1028, 30 L.Ed. 949 (1887)).

■ It is essentially the debtor's position that this case presents a "redivide the pie" scenario where a disgruntled creditor seeks to have the confirmation order "done over" as was the case in *Public Service Co. of New Hampshire v. Richards (In re Public Service Co. of New Hampshire),* 148 B.R. 702, 719 (Bankr.D.N.H.1992), *aff'd,* 848 F.Supp. 318 (D.R.I.1994). *See also Farley v. Coffee Cupboard, Inc. (In re Coffee Cupboard, Inc.),* 119 B.R. 14, 19 (E.D.N.Y.1990), *on remand,* 118 B.R. 197 (Bankr.E.D.N.Y.1990). According to the debtor, First Union seeks revocation by raising issues that it could and should

have raised at the confirmation hearing because, were it more diligent, First Union would have had the same information concerning the property's sale potential as the debtor had at that time. Thus, the debtor argues that it perpetrated no concealment and that this confirmation order is *res judicata* as to the issues raised here because they could have been decided at confirmation. *In re Szostek*, 886 F.2d 1405 (3d Cir.1989). As reflected in the factual findings set forth above, the evidence in this proceeding does not support the argument that knowledge of the property's potential was equally available prior to confirmation to First Union or to the court. As will be discussed later, the fraud required for revocation is fraud upon the court; thus, the debtor is missing the mark arguing that these issues could have been raised by First Union at the confirmation hearing. *Compare Gumpart v. China International Trust & Investment Corp. (In re Intermagnetics America, Inc.)*, 926 F.2d 912, 916 (9th Cir.1991) (distinguishing the *res judicata* effect of a § 363 sale order when a FED.R.CIV.P. 60(b) motion was based upon fraud). Certainly, the court had no access to the concealed information preconfirmation.

■ The court concurs that finality of judgments is very important and were this action brought beyond the 180 day period set forth in § 1144, finality of the confirmation order would be of paramount importance. However, the Congress has specified revocation of a confirmation order as a remedy when, as here, evidence of the plan proponent's fraud becomes apparent within the 180 days following entry of the confirmation order. Accordingly, the court concludes that in the context of this case and § 1144, the finality of the order confirming the plan is not more important than the issue of whether a fraud has been perpetrated upon the court. Therefore, the law does not require a clear and convincing standard on the basis that the confirmation order is final.

The debtor next contends that because the confirmation order is a judgment, the fraud necessary for its revocation must be demonstrated with clear and convincing evidence pursuant to FED.R.CIV.P. 60(b)(3). As noted by counsel for the debtor, this is certainly the rule in the Fifth Circuit when a FED.R.CIV.P. 60(b)(3) motion outside the bankruptcy context is at issue. *Longden v. Sunderman*, 979 F.2d 1095, 1103 (5th Cir.1992). However, revocation of an order of confirmation is a substantive remedy exclusively provided by the Bankruptcy Code, and procedural Rule 60(b)(3) standards do not control. *See, e.g., Stamford Municipal Employees' Credit Union, Inc. v. Edwards (In re Edwards)*, 67 B.R. 1008, 1011 (Bankr.D.Conn.1986) ("persuasive evidence" is sufficient to establish fraud for purposes of confirmation revocation).

According to the Supreme Court, "a standard of proof 'serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.'" *Herman v. Huddleston*, 459 U.S. at 389, 103 S.Ct. at 691 (quoting *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979)). Consequently, even where fraud is alleged, the clear and convincing standard has been reserved for instances "where particularly important individual interests or rights are at stake" whether or not any written instrument is involved. *Id.* See also *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 and *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Usually, there is more at stake than the mere loss of money. *Santosky v. Kramer*, 455 U.S. at 756, 102 S.Ct. at 1396. The Court has further stated that "[a] preponderance-of-the-evidence standard allows both parties to 'share the risk of error in roughly equal fashion' ... [and] ... [a]ny other standard expresses a preference for one side's interests." *Herman v. Huddleston*, 459 U.S. at 390, 103 S.Ct. at 691 (quoting *Addington v. Texas*, 441 U.S. at 423, 99 S.Ct. at 1808); *Grogan v. Garner*, 498 U.S. at 286–87, 111 S.Ct. at 659. Thus, absent "particularly important individual interests or rights," the Supreme Court has said that it presumes the preponderance of evidence "standard is applicable in civil actions between private litigants." *Grogan v. Garner*, 498 U.S. at 286–87, 111 S.Ct. at 659 (quoting *Herman v. Huddleston*, 459 U.S. at 389–90, 103 S.Ct. at 691–92).

In light of this precedent, the debtor argues that the personal and professional reputations of the debtor's partners qualify as particularly important individual interests that trigger application of a clear and convincing standard. The court recognizes that the reputations of the partners here may be impugned by the allegations and findings in this proceeding and that such is of significance. This court is not persuaded that the non-debtor partners' interests in their reputations are as significant as the issue of the partnership debtor's fraud. Moreover, to agree with the debtor's position would be inconsistent with the Supreme Court's conclusion that damage to an individual's reputation from fraud allegations in the dischargeability and other contexts does not rise to the level of interest that requires application of the clear and convincing evidence standard. *Grogan v. Garner,* 498 U.S. at 287–89, 111 S.Ct. at 660.

Indeed, the Supreme Court notes, again in the *Grogan* case, that where the Congress has enacted federal legislation that authorizes substantive federal causes of action for fraud it has consistently applied a preponderance of the evidence standard. *Grogan v. Garner,* 498 U.S. at 287–89, 111 S.Ct. at 660.[1]

As will be more fully discussed in the next section of this opinion, there is certainly authority for the proposition that debtors in possession are fiduciaries to both the bankruptcy court and to any parties in interest affected by the plan. *Official Committee of Unsecured Creditors v. H.B. Michelson (In re Michelson),* 141 B.R. 715, 727 (Bankr. E.D.Cal.1992); *Tri–Cran, Inc. v. Fallon (In re Tri–Cran, Inc.),* 98 B.R. 609, 617 (Bankr. D.Mass.1989); *Kelly v. Giguere (In re Giguere),* 165 B.R. 531, 535 (Bankr.D.R.I.1994). In addition, it may be inferred from the language of § 1107 and the good faith requirements of § 1125 and § 1129 that the Congress intended to require a higher standard of conduct from debtors in possession

than from debtors in cases where a trustee has been appointed. Arguably then, the preponderance of the evidence standard is the standard most applicable to the situation where fraud perpetrated by a debtor in possession in procurement of an order of confirmation is alleged. This is consistent with the view taken recently by the Court of Appeals for the Fifth Circuit that a debtor need only establish § 1129(a) or § 1129(b) cramdown requirements by a preponderance of the evidence. *Heartland Federal Savings & Loan Assoc. v. Briscoe Enterprises, Ltd. II (In re Briscoe Enterprises Ltd., II),* 994 F.2d 1160 (5th Cir.1993); *accord, Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.),* 166 B.R. 428 (C.D.Cal.1993).

Given these reflections of congressional intent, it seems the better view that the standard of proof for § 1144 should be a preponderance of the evidence. Application of this standard would also more fairly allocate the risk of error, given that the debtor in revocation proceedings will ordinarily have superior knowledge and understanding of the events and circumstances surrounding the confirmation and giving rise to the complaint for revocation. Having reached its conclusion, however, the court will moot any concern over the applicable standard in this case by its finding that First Union's proof that the debtor procured an order of confirmation of its plan by fraud was established by clear and convincing evidence.

## FRAUD AND FIDUCIARY OBLIGATIONS

■ As noted above, the section of the Bankruptcy Code that controls this proceeding is § 1144 that provides for the revocation of an order of confirmation upon "request" filed by a party in interest within 180 days of the order's entry, and after notice and a hearing "if and only if" it is shown that such an "order was procured by fraud." 11 U.S.C.

---

1. *See* examples discussed at this page of *Grogan v. Garner.* For example, in the securities law context, the Court has determined that the applicable securities law reflect congressional intent that individuals engaged in the securities industry should be held to a higher standard of conduct with respect to the sale of securities in order

to "rectify perceived deficiencies in available common law protections" for the public. *Herman v. Huddleston,* 459 U.S. at 389, 103 S.Ct. at 691. Accordingly, individuals who claim to be defrauded investors need only prove such fraud by a preponderance of the evidence.

§ 1144. Fed.R.Bankr.P. 7001(5) requires that such a request be in the form of an adversary proceeding. Section 1144 is the only vehicle for revoking an order of confirmation in chapter 11. *See, e.g., First Union National Bank of Florida v. Perdido Motel Group, Inc.,* 142 B.R. 460 (N.D.Ala.1992). *Compare In re Coffee Cupboard, Inc.,* 119 B.R. at 18 (fraud may constitute cause for conversion or dismissal under § 1112(b) in an independent action) and *In re Mobile Freezers, Inc.,* 146 B.R. 1000 (S.D.Ala.1992), *aff'd,* 14 F.3d 57 (Table 11th Cir.1994) (conversion after confirmation was required when equity holders failed to consummate plan yet would reap a windfall from sale of all assets).

■ Not surprisingly, § 1144 provides no definition of fraud for its purposes. *In re Longardner & Assocs., Inc.,* 855 F.2d 455, 461 (7th Cir.1988), *cert. denied,* 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989); *U.S. v. Kostoglou (In re Kostoglou),* 73 B.R. 596, 598 (Bankr.N.D.Ohio 1987); *In re Michelson,* 141 B.R. at 724. However, research of the applicable case law reveals that courts have required that the fraud necessary to revoke confirmation must be actual fraud. *See, e.g., In re Longardner & Assocs., Inc.,* 855 F.2d at 461. By analogy to Fed.R.Civ.P. 60(b)(3) motions, the requisite fraud has traditionally been "fraud upon the court," and includes "attempts to subvert the integrity of the court and fraud by an officer of the court." *In re Intermagnetics of America, Inc.,* 926 F.2d at 916. *See also In re Michelson,* 141 B.R. at 725 for its discussion and conclusion that fraud on the court is a species of § 1144 fraud, which discussion and conclusion are adopted by this court.

In the *Michelson* opinion, Judge Christopher M. Klein has meticulously explored the meaning of the term "procured by fraud" found in § 1144, including discussion of a similar phrase in the Bankruptcy Act of 1898. 141 B.R. at 724. In would be redundant for this court to attempt such an exhaustive discussion, when this court is persuaded by its own research that Judge Klein reached the correct conclusions as to the requisite fraud. Therefore, this court adopts the conclusions of law found in *Michelson* and will further discuss the elements of fraud only to illustrate the application of the law to the facts of this case.

■ Obviously, "determinations of the existence of 'fraud' must be made on the specific facts of each case." *In re Kostoglou,* 73 B.R. at 599. There is rarely direct proof of fraud, but actual fraud may be established with "circumstantial evidence and legitimate inferences arising therefrom." *In re Edwards,* 67 B.R. at 1010 (quoting *Connolly v. Gishwiller,* 162 F.2d 428, 433 (7th Cir.1947)). However, fraud may never be presumed. *In re Edwards,* 67 B.R. at 1011 (citing *inter alia, In re Isidor Klein, Inc.,* 22 F.2d 906, 908 (2d Cir.1927)). In its discussion and findings of fact, this court has considered all of the facts and circumstances and the logical inferences drawn from the proof and has found sufficient proof of the debtor's fraud in procuring the order of confirmation.

There must be evidence of fraudulent intent. *In re Michelson,* 141 B.R. at 725; *In re Longardner & Assocs., Inc.,* 855 F.2d at 462; *Matter of Pence,* 905 F.2d 1107, 1110 (7th Cir.1990). In a case addressing fraudulent conveyances, Judge Alan H.W. Shiff has succinctly stated: "If a defendant in fact committed fraud, it is completely unrealistic to expect an admission of that transgression; rather, a plaintiff is likely to encounter consistent denials. In recognition of that reality, courts have held that fraudulent intent may be inferred from the circumstances...." *Coan v. Andersen (In re Andersen),* 166 B.R. 516, 529 (Bankr.D.Conn.1994). Thus, intent may be inferred from the circumstances and the existence of fraud must be determined on a case by case basis. *See, e.g., In re Edwards,* 67 B.R. at 1009–1010; *In re Kostoglou,* 73 B.R. at 599.

■ In arriving at what conduct constitutes actual fraud for purposes for revocation of an order for a chapter 11 confirmation, the courts have considered and relied upon the requirements for revocation of orders on confirmed plans under chapters 13 and 12, the definition for fraud found in Black's Law Dictionary, and, notwithstanding that this is a question of federal bankruptcy law, the definitions of fraud under state law. *See, e.g., In re Longardner & Assocs., Inc.,* 855

F.2d at 461, n. 6 (chapter 13 elements); *In re Kostoglou,* 73 B.R. at 599 (BLACK'S LAW DICTIONARY, Rev. 5th ed. 1979); *Perdido Motel Group, Inc.,* 142 B.R. at 464 (state common law). The consensus, however, appears to be that a determination of the existence of fraud under § 1144 may be based upon a showing of bad faith on the part of the plan proponent. One court has concluded that there can never be a showing of fraud without proof of bad faith. *In re Coffee Cupboard, Inc.,* 119 B.R. at 18 (citing *In re Kostoglou,* 73 B.R. at 599) (which actually relied upon *Byrd v. Byrd (In re Byrd),* 9 B.R. 357 (Bankr.D.D.C.1981) to conclude that fraud "requires proof of bad faith, immorality or intentional wrongdoing").

With regard to fraud necessary for revocation of an order on a confirmed plan, it has been held in the chapter 13 context and adopted in the chapter 11 context that the plaintiff must prove:

> (1) that the debtor made a representation regarding ...[2] compliance with Code § 1325 [or § 1129] which was materially false;
>
> (2) that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth;
>
> (3) that the representation was made to induce the court to rely upon it;
>
> (4) [that] the court did rely upon it; and
>
> (5) that as a consequence of such reliance, the court entered the confirmation order.

*In re Longardner & Assocs, Inc.,* 855 F.2d at 462, n. 6 (quoting *In re Moseley,* 74 B.R. 791, 803 (Bankr.C.D.Cal.1987)); *In re Edwards,* 67 B.R. at 1010. The last three of these elements for necessary fraud illustrate that "fraud on the court is one species [of fraud] that unquestionably is a basis for revoking the order confirming a plan of reorganization." *In re Michelson,* 141 B.R. at 725. The debtor in this case attempted to show that there was no fraud against First Union or the bondholders or that First Union somehow shared responsibility for any misdeed on

the debtor's part. Those arguments miss the critical point that the court was deceived in its decision to confirm the debtor's plan when the debtor knowingly concealed information about the true market value and willing purchasers of the debtor's sole asset. As Judge Klein correctly observed, "pulling the wool over the eyes of the court impairs the judicial machinery in the performance of its [statutory confirmation] duty." *In re Michelson,* 141 B.R. at 725. In other words, assuming the existence of fraud, it is the reliance of the court rather than reliance of creditors that becomes the focus of inquiry. *In re Kostoglou,* 73 B.R. at 599.

This court agrees with the *Michelson* court that § 1144 fraud may include not only intentional misrepresentations but also misrepresentations by intentional omission "of material facts in the disclosure and confirmation process." *In re Michelson,* 141 B.R. at 725; *see also In re Giguere,* 165 B.R. at 534. As the *Michelson* court discussed, "[c]ompliance with the disclosure and solicitation requirements is the paradigmatic example of what the Congress had in mind when it enacted section 1129(a)(2)." 141 B.R. at 719 (citing the House and Senate Reports). Having reached these conclusions, the prior discussion of the facts demonstrate why fraud exists in the present case. The debtor's disclosures and plans never disclosed the true level of interest in purchasing the property; thus, the debtor intentionally deprived the court, creditors and parties in interest of knowledge that was material in this case. The debtor's arguments that First Union had equal access to knowledge of the marketplace rings hollow when it is clear that the court had no means of knowing the marketplace without disclosure. And, the disclosure responsibility is squarely placed upon the plan proponent by §§ 1125 and 1129, the latter requiring that the plan proponent must comply "with the applicable provisions of title [11]." 11 U.S.C. § 1129(a)(2). Of course, the § 1125 disclosure requirements are included in title 11. The risk of inadequate disclosure

---

**2.** § 1325 sets forth the requirements for confirmation of a chapter 13 plan. The analogous chapter 11 provision is § 1129. Both sections require that any proposed plan be in compliance

with applicable provisions of the Bankruptcy Code and be proposed in good faith. *See* KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 6.57 (2d ed. 1994).

is always on the plan proponent, and this risk continues through the confirmation hearing. *In re Michelson,* 141 B.R. at 720. The debtor may not shift its risk by its argument that it provided all information as requested by First Union. The proof establishes that First Union had no knowledge of the debtor's extensive contacts with purchasers. How then could First Union be expected to inquire? Without knowing all of the material facts and the true intentions of the debtor, First Union and the bondholders could not deal on even terms with the debtor. *See, e.g., Slater v. Smith, et al. (In re Albion Disposal, Inc.),* 152 B.R. 794 (Bankr. W.D.N.Y.1993). It must be noted that First Union was not a creditor in this case. The bondholders were the secured creditors, for whom First Union was bond trustee. The harm caused by the debtor was directed toward the bondholders, and the debtor unsuccessfully attempts to shift the focus now to what First Union did or knew. A critical part of any confirmation hearing is that it must be shown by the plan proponent that the "plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). This court has found that this debtor knew of willing and able buyers but temporarily spurned their offers and "parked" their interests, all for the purpose of preventing the secured bondholders from realizing or capturing the true value of their collateral. The court may not simply call this creative reorganization, when the debtor's strategy, *inter alia,* undermines the integrity of the chapter 11 process.

It must be remembered that a debtor in possession, such as this one, is vested with virtually "all of the rights, and powers, and shall perform [virtually] all of the functions and duties of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a) (*see* exceptions found in §§ 1106(a)(2), (3), and (4)); *see generally Ford Motor Credit Co. v. Weaver,* 680 F.2d 451, 461 (6th Cir. 1982). In its pretrial memorandum the debtor concedes that as a debtor in possession it possessed a fiduciary obligation but contends that its fiduciary duty was not the same as that of a chapter 7 trustee and did not rise to the level of a chapter 11 trustee. In the broadest sense, "[o]fficers of a debtor-in-possession are officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties." *In re Intermagnetics,* 926 F.2d at 917. Moreover, the U.S. Supreme Court has traditionally held that the fiduciary standard applicable to a debtor in possession is that of trustee. *Wolf v. Weinstein,* 372 U.S. 633, 649–50, 83 S.Ct. 969, 979–80, 10 L.Ed.2d 33 (1963). That a debtor in possession is a fiduciary is well settled. *See, e.g., Commodities Futures Trading Commission v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 1994–95, 85 L.Ed.2d 372 (1985).

A prudent trustee would obviously test the market to determine how to obtain the most benefit for the estate. "[S]ince [the trustee's] obligation is to maximize returns to the bankruptcy estate it would not be acceptable for the trustee to grant old equity, or anyone else, an exclusive option to purchase the [estate's] interest without receiving some fair value in return." *In re BMW Group I, Ltd.,* 168 B.R. 731, 735 (Bankr.W.D.Okla.1994). That is exactly what this debtor did: Tenn–Fla deliberately stalled purchasers, concealed that information, and repurchased the partners' equity interest at a sharp discount, knowing that it would be able immediately to resell the property with enough recovery to satisfy the partners' personal exposure to First Tennessee Bank. This was the debtor's acknowledged goal, and it would have accomplished it to the loss of the secured creditors but for this adversary proceeding. The debtor can not argue legitimately that a chapter 11 trustee would have pursued such a course. As two commentators have observed:

> The duty of loyalty and good faith forbids directors and other business operators from using their positions of trust and control over the rights of other parties to further their own private interests, either by usurping opportunities, holding undisclosed conflicts or otherwise exploiting their positions.

Raymond T. Nimmer & Richard B. Feinberg, *Chapter 11 Business Governance: Fiduciary Duties, Business Judgment, Trust-*

*ees And Exclusivity,* 6 BANKR.DEV.J. 1, 35 (1989).

The debtor misrepresented to the court at the confirmation hearing that it proposed its plan in good faith and that the debtor was in compliance with the Code's disclosure requirements. This is best seen in the light of the debtor's plan had a consensual confirmation not resulted. The bondholders had exercised their § 1111(b)(2) election right; thus, § 1129(a)(7)(B) normally would have controlled a consensual plan. However, one effect of the debtor's willful nondisclosure was to deceive the bondholders into accepting the debtor's plan and waiving their § 1111(b)(2) election. The debtor's representatives were fully aware of the effect of that § 1111(b)(2) election. Clearly, had those secured creditors been advised of the true value of the property they would not have consented to sell to the debtor for so much less than their full claim. The bondholders would have retained their full secured claim. As First Union has argued, with full disclosure of the debtor's knowledge of the market, First Union probably would have withdrawn its plan, sought to negotiate a sale to JMB, Colonial or United Dominion, or sought conversion or dismissal in order to foreclose and sell after bankruptcy. First Union had escape clauses in its contracts with Apollo and Hall, allowing termination if to do so would be in the best interest of the bondholders. However, the court is not required to decide what the bondholders would have done; rather, the court knows that it would not have confirmed the debtor's plan had the court known that the debtor knew of an immediate $2,300,000 equity return to insiders of the debtor. In the context of this case, with an § 1111(b)(2) election and the withdrawal of that election under the inducement of the debtor, the need for full and honest disclosure is underscored.

Another effect of the debtor's concealment of its intention to resell the property immediately after confirmation was to deprive the nonrecourse secured creditors of their statutory right to credit bid on the property at any sale pursuant to § 363(b). *See* 11 U.S.C. § 363(k); *In re Kent Terminal Corp.,* 166 B.R. 555 (Bankr.S.D.N.Y.1994). This, of course, is an alternative protection for un-dersecured creditors. Section 1111(b)(1)(A) allows such a creditor to have recourse status unless the property is sold under a plan or under § 363, in which event the creditor would have the right to credit bid at the sale, or unless the creditor elects to protect itself against undervaluation by use of § 1111(b)(2), in which event the "claim is a secured claim to the extent that such claim is allowed." 11 U.S.C. § 1111(b)(2). On one hand, this debtor represented that there was to be no § 363 sale. Rather, upon confirmation of the plan the debtor would retain the property. On the other hand, the debtor's concealment of its predetermined intention to sell after confirmation in reality deceived the bondholders into waiving, *inter alia,* their § 1111(b)(2) election. The bidding at confirmation was not a true auction sale under § 363(b) nor a true credit bid opportunity under § 363(k) for the bondholders, as the debtor had concealed the true market opportunity. The only protection against such abuses in this context is for the debtor's repurchase of the assets to be a good faith, arm's length sale with all material facts revealed to the creditors, parties in interest, and the court. *See* Michael E. Rubinger and Gary W. Marsh, *"Sale of Collateral" Plans Which Deny A Nonrecourse Undersecured Creditor The Right To Credit Bid: Pine Gate Revisited,* 10 BANKR.DEV.J. 265 (1994).

Professor Elizabeth Warren has pointed out that there are three entities involved in the typical successful chapter 11 confirmation process: the prebankruptcy debtor, who gives way to the debtor in possession, who disappears at confirmation when the postbankruptcy entity acquires the assets of the estate. Elizabeth Warren, *A Theory Of Absolute Priority,* 1991 ANN.SURV.AM.L. 9 (1992) (reprinted as appendix to *In re BMW Group I, Ltd.,* 168 B.R. 731) (hereinafter "Warren"). The debtor in possession "works on behalf of all the creditors" and "owes a fiduciary obligation to the creditors to get the best possible price for estate assets." Warren, 168 B.R. at 737. "To do less not only violates the duty imposed on a DIP operating a business in chapter 11, but it also violates the principal reason for a reorganization—to enhance return to the creditors and

to increase the opportunity for reorganization of the business." *Id.* Professor Warren identified two factors that contribute to a difficulty of obtaining the best value in a sale of a chapter 11 business: "The thinness of the market for the business, and the possibility for self-dealing by the manager charged with selling the business." *Id.* at 738. This debtor represented to creditors and to the court that there was a thin market for sale of the property, when in reality the debtor had exclusive knowledge of a large and active market for sale at a premium. It follows that the debtor's concealing of the true market was an intentional act of self-dealing, which violated the debtor's fiduciary duty to creditors and to the court.

Debtors in possession have fiduciary duties to all their creditors. 11 U.S.C. § 1107; *Wolf v. Weinstein,* 372 U.S. at 644, 83 S.Ct. at 977; *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *CFTC v. Weintraub,* 471 U.S. at 355, 105 S.Ct. at 1994; *In re Albion Disposal, Inc.,* 152 B.R. at 816. "Indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *CFTC v. Weintraub,* 471 U.S. at 355, 105 S.Ct. at 1995. These fiduciary responsibilities encompass a duty of care and a duty of loyalty. The debtor in possession's fiduciary duty of care includes a duty to preserve and conserve the estate assets so as to maximize the benefits available for all creditors. *U.S. v. Aldrich (In re Rigden),* 795 F.2d 727 (9th Cir.1986). In addition, the debtor in possession is obligated in this fiduciary capacity "to provide voluntary and honest disclosure of financial information—a reasonable *'quid pro quo'* for its temporary relief from substantial financial obligations." *In re Sal Caruso Cheese, Inc.,* 107 B.R. 808, 817 (Bankr.N.D.N.Y.1989) (citations omitted). The duty of loyalty prohibits self dealing by the debtor in possession. *In re Albion Disposal, Inc.,* 152 B.R. at 812–817; *In re Microwave Products of America, Inc.,* 102 B.R. 666, 672 (Bankr.W.D.Tenn.1989). From these mandates, it is obvious that, at a minimum, a debtor in possession is required to deal with its creditors, parties in interest and

the court in good faith and to avoid self-dealing. Therefore, at least with respect to these elements of fiduciary duties, the debtor's argument has no merit, and it may be concluded that the debtor in possession's fiduciary duties rise to the level of those expected of a trustee.

Certainly it is safe to assume that by enactment of the chapter 11 disclosure provisions, the Congress intended full and fair disclosure to creditors and parties in interest affected by the proposed plan. As noted by the *Michelson* court, "[t]he purpose of the disclosure process is to obviate, not necessitate, independent investigations before agreeing to a reorganization." 141 B.R. at 719. This debtor's disclosure representations, including its willful and intentional omission of material market information, were designed in bad faith to conceal and misrepresent the true facts. At a minimum, the debtor acted in reckless disregard for the truthfulness of its disclosures. The debtor's lack of disclosure and bad faith misrepresentations were made for the purpose of obtaining an order of confirmation, and the court relied upon the debtor's representations that all § 1129(a) elements were satisfied. Not only were the debtor's actions taken in bad faith to obtain the confirmation order, they also undermine the integrity of the Bankruptcy Code and the judicial process itself. The debtor's success in its strategy would be a mockery to creditor and public confidence in chapter 11 and the judicial system.

It is the debtor's position that qualifying omissions in the disclosure and confirmation process such as these alleged here as fraud will turn the law pertaining to the confirmation process "on its head." To the contrary, the debtor's theory "turns the duty to disclose on its head." *In re Michelson,* 141 B.R. at 729. The debtor argues that a definition of fraud that includes omissions is outside the mainstream of affirmative misrepresentation that should be the only conduct sufficient to qualify as fraud necessary to revoke a confirmation order. The court disagrees. The debtor's reliance on *In re Public Service Co. of New Hampshire,* 148 B.R. 702, is misplaced. That opinion found that the *res judicata* effect of the confirmation

order precluded creditors from raising contentions that they did raise or had the opportunity to raise in the disclosure or confirmation process. That court acknowledged an exception to this effect in such cases as *Michelson* where a "secret fraud" exists at the time of confirmation. 148 B.R. at 720. Here, the debtor's fraudulent omissions were not discovered until after entry of the confirmation order. Section 1144 is specifically designed for such a circumstance. According to the debtor, the facts here are not capable of establishing fraud in procurement of the order of confirmation because First Union had equal access to the information possessed but undisclosed by the debtor. The debtor asserts that this case is merely one of innocent mistaken valuation, a fact that is not even material according to the debtor. Contrary to the debtor's assertion, this case involves much more than mistaken valuation. *Compare Matter of Pence*, 905 F.2d at 1111 ("Just because the estimate [of value based upon an appraisal] turned out to be a poor one does not mean that [the chapter 13 debtor] had an intent to deceive.") with *In re Kostoglou*, 73 B.R. at 601 ("[A]n expression of opinion, given falsely and with intent to deceive, is actionable."). The debtor's strategy was malevolent: To deprive the bondholders of the amount to which they were entitled under the Bankruptcy Code.

The debtor also relies upon *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir.1991), for its view of the fiduciary duty owed by a debtor in possession. The facts of *Schipper* clearly are distinguished from the present facts. In *Schipper* § 363 rather than § 1144 was at issue. In *Schipper* the debtor had a prebankruptcy offer for purchase of realty, but the buyer backed out and did not reappear with a new offer until one year after the debtor had consummated a § 363 sale of the realty to his parents. There was no evidence of fraud in the entire transaction. The standards of § 363 were found to have been met. There was no evidence in *Schipper* of the debtor deliberately "parking" the ultimate purchaser in order to prevent creditors from obtaining the real value of the property. As the *Schipper* court instructed, it is necessary to take "a close look at the details of the [particular]

transactions" in order to determine if "first impressions are deceiving" or if the debtor intended actual fraud. 933 F.2d at 516. This court has closely examined the facts and circumstances before it and finds the *Michelson* opinion to be instructive.

The *Michelson* case involved confirmation of a chapter 11 plan premised upon the alleged managerial skills of an individual purported by the debtor in possession and its counsel to be an expert manager but who actually was known to the debtor and its counsel to be a felon convicted of mail fraud and facing several years of incarceration. This manager, although the successful founder of an aerospace company, had also managed this five million dollar company into a chapter 7, a fact known to counsel. In its determination of the elements necessary for demonstrating fraud under § 1144, the *Michelson* court concluded that "[s]pecific intent to defraud ... is not needed; [r]ather the requisite intent, in the context of defective disclosure, exists where there is intentional omission of material fact." 141 B.R. at 725. Similarly, the *Giguere* case involved a chapter 11 debtor's failure to disclose her interest and, thus the estate's interest, in valuable assets. *In re Giguere*, 165 B.R. at 535. That debtor claimed that she was holding those assets in her name for someone else. That court adopted the definition for fraud in this context as espoused by *Michelson*. Further, according to the *Giguere* court, "[t]he existence of assets in which the Debtor *may have an interest* is among the most significant information that creditors can have, and it is not for the Debtor to determine, unilaterally and secretly, whether her financial interests and property rights would or would not be of interest or available to creditors." *Id.* (emphasis in original).

 This court concludes that the premise of intentional omission may logically be extended to apply to this debtor's knowledge of potential, capable purchasers of the estate's property, who were actively pursuing their interests in purchasing the property and whose purchase of such property would result in increased return for creditors of the estate. The court has made a factual finding in this proceeding that information regarding

"parked" purchasers and the increased value of the estate's asset represented by those purchasers was material. It is not for the debtor alone to decide that information which would affect the return available for creditors in a chapter 11 case is or is not material. Materiality in the chapter 11 context is judged "by an objective standard drawn from the definition of 'adequate information' at section 1125 that asks what the 'hypothetical reasonable investor typical of holders of claims or interests of the relevant class' would want to know in order to make an informed judgment about the plan." *In re Michelson,* 141 B.R. at 725 (quoting 11 U.S.C. § 1125(a)(1)).

From the above, the court concludes in accordance with *Michelson* and *Giguere* that while § 1144 requires proof of actual fraud, such fraud may be established with evidence of "misrepresentation by omission, of material facts in the disclosure and confirmation process." *In re Michelson,* 141 B.R. at 725; *In re Giguere,* 165 B.R. at 534. Again, following *Michelson,* this court concludes that this debtor was obligated to disclose the existence of highly interested and qualified purchasers who had been "parked" by the debtor, that this information was material to the court as well as to creditors and that the debtor's failure to disclose was an intentional omission with a purpose of preserving a substantial investment recovery for the debtor's insiders while knowingly depriving the secured creditors of their rights and ultimately the true value of the property of the bankruptcy estate. As a result of the court's findings and conclusions, the court must revoke the order confirming the debtor's plan. A necessary corollary is that the discharge under § 1141(d) is also revoked. 11 U.S.C. § 1144(2).

## CONSTRUCTIVE TRUST, LIEN AND DAMAGES

In addition to revocation of the order of confirmation, which substantially would restore the debtor and the bondholders to their preconfirmation position, First Union seeks

other remedies including a constructive trust on all of the sale proceeds, the attachment of the bondholders' lien to all sale proceeds, and damages. The court having determined that revocation is required and there being no issue about the validity of the bondholders' claim to the extent of its $13,155,766.59 claim, the bondholder's secured claim and lien attach to the entire sale proceeds that remain in escrow. *See* Proof of Claim 30. It would be redundant to impress a constructive trust on those sale proceeds.

Damages, however, are appropriate. The revocation of the order of confirmation does not completely restore the bondholders to their preconfirmation rights. The court had earlier ordered payment to other subordinate classes of creditors in the confirmed plan, and First Union seeks a judgment for all payments to junior classes of creditors. The claim of Sunburst Bank was an unsecured one; yet, presumably to obtain at least one accepting class, the debtor agreed to pay Sunburst $20,000.[3] Absent a confirmed plan, Sunburst would have received nothing on its claim that was junior to the bondholders' secured claim. However, the bondholders' plan filed by First Union proposed to pay Sunburst $15,000. It would be inconsistent to award the bondholders a judgment for the payment to Sunburst, as the bondholders were willing to pay Sunburst if their plan had been confirmed.

In contrast to the nonrecourse bond debt, the class 7 unsecured trade creditors were recourse claims against the partners. There is proof in the record that the partnership is not insolvent, taking into consideration the personal net worth of the partners. Trial exhibit 28. Moreover, there is no proof that the trade creditors had liens against the property superior to the first mortgage of the bondholders. As a result, the unsecured creditors would not be entitled to receive a distribution from a sale of the property until the secured claims were satisfied in full. While it would appear that the bondholders may only be compensated for the full value of their secured claim if they are compensated

---

**3.** In the consensual July 19, 1994 order for payment of creditors, the parties state that Sunburst and MuBen were each paid $10,000 at closing.

in the amount of the payments to the class 7 unsecured creditors, as with Sunburst the bondholders' plan provided for full payment to each unsecured creditor under $10,000, with payment to be made out of the proceeds from the sale proposed in First Union's plan. The July 19, 1994 consent order for payment reveals that no unsecured creditor exceeds $10,000. Thus, again it would be inconsistent to award the bondholders a judgment for payments to the unsecured class.

While First Union's plan provided for no payment to MuBen, which was an unsecured creditor, the court previously held that Mu-Ben relied in good faith on the order of confirmation. MuBen was paid $10,000 at the closing of the United Dominion sale and the sale was dependent upon MuBen's release of its recorded mortgage. After consideration of all of the circumstances, the court will not award damages to the bondholders for this payment to MuBen.

 However, the bondholders have been required to incur professional fees· and expenses related to this revocation proceeding. The court had earlier allowed the bondholders' administrative expense claim; however, the bondholders unnecessarily had additional professional, including legal, expenses directly caused by the debtor's procuring its order of confirmation by fraud. The bondholders may only be made whole if they are compensated for their professional fees and expenses related to this adversary proceeding, including the discovery costs incurred after the confirmation hearing. First Union's counsel are to prepare, file and serve affidavits, with appropriate supporting time and expense records, of the professional fees and expenses incurred by First Union on behalf of the bondholders after the confirmation hearing and continuing until the date of filing of the affidavits. The debtor, the United States Trustee, or other parties in interest may move within ten (10) days of filing of those affidavits for a hearing by filing an objection to such requested fees or expenses. Absent a timely objection, First Union's counsel shall promptly prepare and submit a proposed order allowing a judgment for its requested professional fees and expenses.

First Union also sought punitive damages for the debtor's breach of fiduciary duty. Punitive damages are often intended as punishment or as a determent to future violations. *See, e.g., Palmer v. Levy (In re Levy)*, 951 F.2d 196, 198 (9th Cir.1991) (citations omitted). The court is not concerned that this debtor will repeat its fiduciary abuses because the court will grant First Union's motion to convert this chapter 11 case to one under chapter 7 of the Bankruptcy Code. In view of that conversion and the full benefit of the sale having been given to the bondholders, the court will deny the request for additional punitive damages.

## CONVERSION

 In a separate order, the court will grant First Union's motion to convert this chapter 11 case to one under chapter 7 for cause. A conversion will allow the appointment of a chapter 7 case trustee who may utilize § 723 if necessary to "pay in full all claims which are allowed." 11 U.S.C. § 723(a). In light of the court's findings and conclusions as to revocation of the order of confirmation, it would be inconsistent for the court not to find cause for conversion under § 1112(b)(6).

## CONCLUSION

Based upon the court's findings of fact and conclusions of law, the order of confirmation of the debtor's plan and the concomitant discharge resulting therefrom will be revoked pursuant to 11 U.S.C. § 1144. In addition, monetary damages will be awarded to First Union, as bond trustee for the bondholders, in the amount of its necessary and reasonable professional fees and expenses incurred as a result of the debtor's procuring its order of confirmation by fraud. Separate orders and judgments will be entered implementing the § 1144 revocation and awarding monetary damages.

Another separate order will be entered converting this chapter 11 case to one under chapter 7 and directing the United States trustee to appoint an interim trustee under 11 U.S.C. § 701. That order will also provide for notice by the clerk to creditors and

other parties in interest of this revocation and conversion.