**LASALLE NATIONAL BANK,
as successor Indenture
Trustee, Plaintiff,**

v.

**Ronald O. PERELMAN, Mafco Holdings Inc., MacAndrews & Forbes Holdings, Inc., Andrews Group Incorporated, Four Star Holdings Corp., Mafco Guarantor Corp. f/k/a Marvel V Holdings Inc., Mafco Finance Corp. f/k/a Marvel IV Holdings Inc., William C. Bevins, Donald G. Drapkin, Irwin Engelman, Laurence Winoker, Glenn P. Dickes, Joram C. Salig, Howard F. Gordon, David L. Cook and Doe Defendants 1 through 100, Defendants.**

**No. Civ.A. 97–645–RRM.**

United States District Court,
D. Delaware.

Feb. 7, 2000.

Joanne B. Wills, Mindy Friedman, Cynthia A. Clark, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Delaware, James E. Spiotto, Franklin H. Top III, Mark D. Rasmussen, Chapman and Cutler, Chicago, Illinois, for plaintiff.

Rodman Ward, Jr., and Anthony W. Clark, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Robert E. Zimet, and Susan Saltzstein, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for defendants.

## OPINION

McKELVIE, District Judge.

This is a commercial case. In 1993 and 1994, Marvel Holdings Inc. ("Holdings"), Marvel (Parent) Holdings Inc. ("Parent") and Marvel III Holdings Inc. ("Marvel III") (collectively, the "Marvel Holding Companies") issued a series of notes secured by stock of their subsidiary, Marvel Entertainment Group, Inc. ("Marvel"). The directors of the Marvel Holding Companies used the $550 million in proceeds from the notes to pay dividends to their parent corporations. Less than three years later, on December 27, 1996, Marvel and the Marvel Holding Companies filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code.

Plaintiff LaSalle National Bank ("LaSalle") is the successor indenture trustee for the notes that were issued by the Marvel Holding Companies. Defendants are officers and directors of the Marvel Holding Companies and their parent corporations.

On December 8, 1997, LaSalle filed a complaint alleging that the officers and directors of the Marvel Holding Companies breached their fiduciary duties to the noteholders when they used proceeds from the notes to pay dividends to the parent corporations. LaSalle also contends that the parent corporations were unjustly enriched when they retained the dividends. LaSalle seeks to collect amounts due on the notes.

This case is scheduled for an eight day jury trial beginning on February 28, 2000.

On October 29, 1999, the defendants moved for summary judgment on all counts. The parties have completed briefing on the motion. The court heard oral argument on December 20, 1999. This is the court's decision on the motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the affidavits, documents and deposition transcripts submitted by the parties.

### A. The Parties

#### 1. Plaintiff LaSalle National Bank

Plaintiff LaSalle is the successor indenture trustee for the notes that were issued by the Marvel Holding Companies. NationsBank of Georgia was the original indenture trustee. NationsBank was succeeded first by Bank of New York and thereafter by LaSalle. LaSalle is a national banking association with its principal place of business in Chicago, Illinois.

#### 2. Defendants

Defendants Mafco Holdings Inc. ("Mafco"), MacAndrews & Forbes Holdings Inc. ("MacAndrews"), Andrews Group Incorporated ("Andrews"), Four Star Holdings Corp. ("Four Star"), Mafco Guarantor Corp. and Mafco Finance Corp. (collectively, the "Parent Companies") are parent corporations of the Marvel Holding Companies. The Parent Companies are Delaware corporations with their principal places of business in New York City.

Defendants Ronald O. Perelman, William C. Bevins, Jr., Donald G. Drapkin, Irwin Engelman, Laurence Winoker, Glenn P. Dickes, Joram C. Salig, Howard F. Gordon and David L. Cook are officers and directors of the Parent Companies and the Marvel Holding Companies.

Perelman owns and controls a complex corporate hierarchy that includes the Parent Companies and the Marvel Holding Companies. Each corporation within the hierarchy owns 100% of the common stock of its immediate subsidiary. Perelman owns 100% of Mafco; Mafco owns 100% of MacAndrews; MacAndrews owns 100% of Andrews; Andrews owns 100% of Four Star; Four Star owns 100% of Marvel III;[1] Marvel III owns 100% of Parent; and Parent owns 100% of Holdings. Figure 1 is an illustration of the corporate hierarchy.

---

**1.** Four Star also owns 100% of the common stock of Mafco Guarantor and Mafco Guarantor owns 100% of the common stock of Mafco Finance.

**Figure 1 – Hierarchy of Marvel and Its Parent Corporations**

B. *Perelman's Acquisition of Marvel*

Marvel has published comic books since 1939 and has developed more than 3,500 proprietary characters including Spider Man, the Incredible Hulk and the Fantastic Four. Marvel generates its revenues from publishing and advertising and licensing of its properties. At one point in the 1990s, Marvel was the largest creator and publisher of comic books in North America.

In December 1988, Perelman sought to acquire Marvel. To accomplish this goal, the board of directors of Andrews formed a new wholly-owned subsidiary, Parent.[2] Andrews made a $10 million initial capital contribution to Parent. On January 6, 1989, Perelman, through Parent, purchased Marvel from New World Entertainment Ltd. for $82.5 million. Perelman, Bevins and Drapkin served on Marvel's board of directors and Perelman became the chairman of the board.

After the acquisition, Perelman indirectly owned all of the stock of Marvel. On July 22, 1991, Perelman, through Parent, sold 40% of the issued and outstanding stock of Marvel in an initial public offering. The 16.8 million shares of Marvel common stock were sold at $4.125 apiece. The net proceeds of $63.7 million from the offering were used to reduce Marvel's indebtedness by $26.5 million and to pay a cash dividend of $37.2 million to Parent. After the public offering, Perelman retained ownership and control of 60% of the common stock of Marvel.

Less than one year after the initial public offering, Marvel stock was trading at $65 a share and Perelman began expanding the company's operations. Marvel entered the sports trading card market by acquiring Fleer Corp. for $286 million. In April 1993, Marvel acquired a 46% interest in Toy Biz, Inc. in exchange for, in part, a perpetual, royalty-free license to make toys using Marvel characters. In August 1994, Marvel entered the children's activity sticker market in Europe through its acquisition of an Italian company, Panini S.r.l., for $158 million. Finally, in April 1995, Marvel acquired an entertainment trading card company, SkyBox International Inc. for $165 million.

### C. *The Marvel Holding Company Notes*

It was during this period of expansion in the early 1990s that the Marvel Holding Companies issued a series of notes that are the subject of this action.

### 1. *The Holdings Note Sale*

On March 26, 1993, Perelman commenced a tender offer to increase his ownership of Marvel through Parent by 20% of the outstanding common stock. After the tender offer, Perelman hoped to own 80% of Marvel's outstanding stock because that would allow him to consolidate Marvel's tax returns with those of the Parent Companies.

In order to finance the tender offer, the board of directors of Parent, consisting of Perelman, Bevins and Drapkin, formed a new wholly-owned subsidiary, Holdings, and contributed 50.1% of Marvel's outstanding common stock to Holdings. On April 22, 1993, Holdings issued zero coupon notes with a face amount of $517,447,-000 and an effective yield of 11.25% (the "Holdings Notes"). The Holdings Notes were due on April 15, 1998.

The Holdings Notes were secured by 24 million shares of Marvel stock that Holdings owned. The 24 million shares represented approximately 50.1% of the outstanding common stock of Marvel. At closing, Merrill Lynch, Pierce, Fenner & Smith Inc. provided a certificate of fair value to the indenture trustee of the Holdings Notes certifying that, based on the closing price of Marvel stock on April 21, 1993, the fair value of the collateral for the Holdings Notes was $594 million, or $77 million more than the face value of the notes. The Marvel stock that Holdings pledged to the trustee was not registered with the Securities and Exchange Commission and bore a restriction prohibiting its sale in the public market.

After Holdings received net proceeds of $289 million from the note sale, the board of directors of Holdings, consisting of Perelman, Bevins and Drapkin, determined that the company had a surplus of $583 million based in part on the market price

---

**2.** Parent was formerly known as New Marvel Holdings Inc.

of Marvel's stock. As a result, the board declared a dividend of $288 million which Holdings paid to its sole shareholder, Parent.

Perelman used the $288 million from the dividend to purchase more Marvel stock through Parent. In the tender offer on May 10, 1993, Parent purchased $10 million of Marvel stock at $30 per share. As a result of the tender offer, Parent owned 28.9% of Marvel.[3] In addition, Parent owned 100% of its subsidiary, Holdings, and Holdings in turn owned 50.1% of Marvel. Figure 2 is an illustration of the transaction.

**Figure 2 – Holdings Note Sale**

### 2. *The Parent Note Sale*

In the fall of 1993, as Marvel continued to prosper, Perelman decided to offer additional high-yield bonds secured by Marvel stock. On October 20, 1993, Parent issued zero coupon notes with a face amount of $251,678,000 and an effective yield of 11.875% (the "Parent Notes"). The Parent Notes were due on April 15, 1998.

The Parent Notes were secured by 10 million shares of Marvel stock owned by Parent and all of the outstanding stock of Holdings. The 10 million shares represented approximately 21% of the outstanding common stock of Marvel. At closing, Bear, Stearns & Co. provided a certificate of fair value to the indenture trustee of the Parent Notes certifying that, based on the closing price of Marvel stock on October 19, 1993, the fair value of the Marvel shares pledged as collateral for the Parent Notes was $489 million, or $237 million more than the face amount of the notes. The Marvel stock that Parent pledged to the trustee was restricted and could not be traded on the public market.

As soon as Parent received net proceeds of $145 million from the note sale, the board of directors of Parent, consisting of Perelman, Bevins and Drapkin, determined that Parent had a surplus of $315 million based in part on the market price of Marvel's stock. As a result, the board declared a dividend of $145 million which Parent paid to its sole shareholder, Four Star. Figure 3 is an illustration of the transaction.

3. After the March 26, 1993 tender offer, Perelman, through Parent, acquired additional shares of Marvel, raising Parent's stake in Marvel to approximately 30.5%.

286

Figure 3 – Parent Note Sale

### 3. *The Marvel III Note Sale*

The third and final of the note sales at issue occurred in February 1994. Prior to the note sale, the board of directors of Four Star, consisting of Perelman, Bevins and Drapkin, formed a new wholly-owned subsidiary, Marvel III, and contributed 100% of Parent's outstanding common stock to Marvel III. On February 18, 1994, Marvel III issued zero coupon notes with a face amount of $125,000,000 and an effective yield of 9.125% (the "Marvel III Notes"). The Marvel III Notes were due on February 15, 1998.

The Marvel III Notes were secured by the outstanding stock of Parent and, through a non-recourse guarantee from Parent, 9.3 million shares of Marvel stock owned by Parent that had not been pledged to secure the Parent Notes. The 9.3 million shares represented approximately 9.5% of the outstanding common stock of Marvel. At closing, the indenture trustee of the Marvel III Notes received a certificate of fair value from Merrill Lynch certifying that, based on the closing price of Marvel stock on February 7, 1994, the fair value of the Marvel shares pledged as collateral for the Parent guarantee was $250 million, or $125 million more than the face amount of the Marvel III Notes. The Marvel stock that Parent pledged to the trustee was restricted and could not be traded on the public market.

The same day that Marvel III received net proceeds of $121 million from the note sale, the board of directors of Marvel III, consisting of Perelman, Bevins and Drapkin, determined that Marvel III had a surplus of $1.5 billion based in part on the market price of Marvel's stock. As a result, the board declared a dividend of $121 million which Marvel III paid to its sole shareholder, Four Star. Figure 4 is an illustration of the transaction.

**Figure 4 – Marvel III Note Sale**

### D. Disclosures in the Indenture Agreements

The offering memoranda for each of the three note sales are similar and warn prospective investors of various risks associated with the notes. First, the offering memoranda explain that the issuer is a holding company with no business operations or independent source of income. Next, each offering memorandum provides that the issuer does not expect that distributions, if any, from Marvel will be sufficient to pay interest on the notes or the principal amount of the notes at maturity. The offering memoranda further provide:

> There can be no assurance as to the value of the collateral at any time or that the proceeds from the sale or sales of all such collateral would be sufficient to satisfy the amounts due on the Notes upon an Event of Default. In addition, the ability of the trustee or the holders of the Notes to realize upon the collateral may be subject to certain limitations, and there can be no assurance that the Trustee or the holders would be able to

sell the collateral at the then current market price of Marvel common stock, as sales of substantial amounts of Marvel common stock could adversely affect market prices.

Moreover, each offering memorandum discloses that the net proceeds from the notes will be distributed to the issuer's parent companies and that none of the proceeds will be available to the issuer. The offering memoranda state:

> The net proceeds from the Offering are expected to be distributed by the Issuer to its parent and will not be available to the Issuer or its subsidiaries. The Issuer's parent will use such proceeds to pay indebtedness of affiliates of the Issuer, other than indebtedness of the Issuer and its subsidiaries, and for general corporate purposes.

Finally, the offering memoranda disclose that the notes will not be guaranteed by Marvel, the Marvel Holding Companies, or any affiliates of the issuer.

### E. *The Decline of Marvel*

In 1994, Marvel's operations began to deteriorate, in part due to lower comic book sales which reduced Marvel's comic book revenues. The company's situation was compounded by the Major League Baseball players' strike that cut short the 1994 season. Additional labor problems in hockey and basketball affected Marvel's return on the sports trading card business.

By the end of 1996, Marvel's stock had plummeted from a high of $65 a share in 1992 to less than $3 a share. Marvel failed to satisfy certain financial covenants in credit agreements with its secured bank lenders. Marvel's cash revenues were depleted and the company was unable to fund operations. Therefore, Perelman, Bevins, Drapkin and the other senior management of Marvel and the Parent Companies sought to restructure the company.

### 1. *The Andrews Proposal*

On November 12, 1996, the board of directors of Andrews developed a plan to restructure Marvel (the "Andrews Proposal"). Under the Andrews Proposal, Marvel would issue new stock to Andrews at approximately $0.85 a share. Through Andrews, Perelman would purchase enough stock to acquire an 80% stake in a restructured Marvel in exchange for $350 million in cash or an equal value of shares of Toy Biz. As a result, the Andrews Proposal would dilute the value of the stock that the Marvel Holding Companies pledged as collateral for the notes. On December 27, 1996, CS First Boston issued an opinion advising the Marvel board of directors that the consideration to be received by Marvel under the terms of the Andrews Proposal was fair.

At that time, Marvel already owned 46% of the outstanding common stock of Toy Biz. Andrews had agreements in place to purchase the remaining stock in Toy Biz, contingent upon Marvel's acceptance of the Andrews Proposal. On December 24, 1996, Wasserstein Perella & Co. issued an opinion advising the Toy Biz board of directors that the Andrews Proposal was fair to the shareholders of Toy Biz.

Under the Andrews Proposal, Perelman contemplated that Marvel would be restructured to allow the company to obtain additional borrowing capacity under its credit agreements. Moreover, the Marvel stock acquired by Andrews pursuant to the proposal would not be subject to liens under the Marvel Holding Company indentures. In order to restructure Marvel to meet these requirements, the board of directors of Marvel declared bankruptcy.

### 2. *The Marvel Bankruptcy*

On December 27, 1996, Marvel and the Marvel Holding Companies filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Marvel's proposed reorganization plan, based on the Andrews Proposal, was filed the same day. The success of the Andrews Proposal depended on Marvel's emergence from bankruptcy within three months.

The bankruptcy took much longer than three months. What started as a relatively friendly bankruptcy managed by Perelman and Marvel's secured lenders, turned into a massive commercial dispute after the noteholders, led at times by LaSalle and by Carl C. Icahn, took control of the Marvel Holding Companies and replaced Marvel's board of directors. The noteholders rejected the Andrews Proposal. It was not until July 31, 1998 that the court entered an order approving a plan of reorganization for the companies.

### F. *The Lawsuit*

### 1. *LaSalle's Complaint*

On December 8, 1997, LaSalle filed a complaint in this court which it later amended, seeking to collect on the amounts due on the notes. The amended complaint states twelve counts against the defendants. LaSalle does not always specify which defendants it alleges are liable for the twelve different causes of action.

Counts I through VI allege that the officers and directors of the Marvel Holding Companies breached their fiduciary duties to the noteholders when they used proceeds from the notes to pay dividends to the Parent Companies. Counts I, III and V allege that the dividends violated 8 Del.C. §§ 170, 173 and 174 because the Marvel Holding Companies were insolvent when they paid the dividends. Counts II, IV and VI allege that the dividends constituted wrongful transfers under Delaware common law. LaSalle also alleges that Perelman and the Parent Companies were unjustly enriched when they retained the dividends.

In Count VII, LaSalle contends that the court should pierce the corporate veil of the Marvel Holding Companies and each of the Parent Companies and hold Perelman, as Mafco's sole shareholder, liable for the amounts due on the notes. Count VIII alleges that the officers and directors of the Marvel Holding Companies breached their fiduciary duties to the noteholders under Delaware law by "upstreaming" the proceeds of the note sales, filing bankruptcy petitions for the Marvel Holding Companies and by submitting the Andrews Proposal. Count IX alleges that the officers and directors of the Parent Companies aided and abetted those breaches of fiduciary duties.

Count X alleges that Perelman and the other individual defendants interfered with the noteholders' contractual rights under the indentures by filing bankruptcy petitions for the Marvel Holding Companies and announcing the Andrews Proposal. In Count XI, LaSalle contends that it is entitled to assert a constructive trust or equitable lien on the proceeds of the notes to remedy the unjust enrichment by Perelman and the Parent Companies. Finally, Count XII alleges that the defendants committed civil conspiracy by conspiring to upstream the proceeds of the note sales.

### 2. *Defendants' Answer and Counterclaims*

On December 3, 1999, the defendants filed their answer denying the allegations in LaSalle's complaint and asserting a number of affirmative defenses. The defendants also counterclaim that LaSalle breached the Marvel Holding Company indenture agreements by filing its lawsuit. Finally, the defendants seek contribution from LaSalle in the event that the defendants are found liable.

On October 29, 1999, the defendants moved for summary judgment on all counts in LaSalle's amended complaint.

## II. *DISCUSSION*

### A. *Choice of Law*

At the outset, the court must determine what substantive law applies to the allegations in LaSalle's amended complaint. The defendants argue that certain claims in the amended complaint are governed by New York law based on a choice of law provision in the indenture agreements. On the other hand, LaSalle contends that the law of Delaware, the state of incorporation of the Marvel Holding Companies, governs all of the claims asserted in the amended complaint.

The court finds that the Delaware law governs this action because all of LaSalle's claims concern the conduct of officers, directors and controlling shareholders of the Marvel Holding Companies. The law applicable to a contract dispute under the indentures does not control claims relating to the internal affairs of the corporation. *See McDermott Inc. v. Lewis,* 531 A.2d 206, 214–15 (Del.1987) (holding that the "law of the state of incorporation should determine issues relating to internal corporate affairs").

### B. *Legal Standard for Summary Judgment*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating the absence of material issues of fact. *Id.* at 323, 106 S.Ct. 2548. When deciding a motion for summary judgment, the court views the facts, and all permissible inferences from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the record could not lead a reasonable jury to find for the non-moving party, disposition by summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### C. Breach of Fiduciary Duty Claims

■ While LaSalle asserts a number of legal theories in its complaint, this case turns in large part on the question of whether the officers and directors of the Marvel Holding Companies owed LaSalle a fiduciary duty. Under Delaware law, officers and directors of a corporation generally do not owe a fiduciary duty to the creditors of the corporation unless the corporation is insolvent. *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 790 (Del. Ch.1992) (holding that "fiduciary duties to creditors arise when one is able to establish the fact of insolvency"); *Credit Lyonnais Bank Nederland v. Pathe Communications Corp.*, 1991 WL 277613, at *34 (Del.Ch. Dec.30, 1991) (finding that officers and directors of a corporation owe fiduciary duties to creditors when the corporation is "operating in the vicinity of insolvency"); *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 813 (Del.1944).

LaSalle contends that the officers and directors of the Marvel Holding Companies owed fiduciary duties to the noteholders and that they breached those duties on two occasions. First, LaSalle argues that the officers and directors breached their fiduciary duties when they declared dividends and "upstreamed" the proceeds from the note sales to the Parent Companies. Second, LaSalle contends that the officers and directors breached their fiduciary duties to the noteholders when they filed bankruptcy petitions for the Marvel Holding Companies and submitted the Andrews Proposal.

### 1. Pre–Bankruptcy Fiduciary Duties

### a. Did officers and directors owe fiduciary duties to LaSalle?

■ As stated above, whether the officers and directors owed fiduciary duties to the noteholders when they paid dividends after the note sales depends on whether the Marvel Holding Companies were insolvent at that time. Under Delaware law, a corporation is insolvent when it is unable to pay its debts as they become due in the ordinary course of business. *Odyssey Partners, L.P. v. Fleming Companies, Inc.*, 735 A.2d 386, 417 (Del.Ch.1999) (quoting *Geyer*, 621 A.2d at 789). In *Geyer*, the Court of Chancery of the State of Delaware went on to explain that "an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held." *Geyer*, 621 A.2d at 789.

In this case, the defendants contend that the Marvel Holding Companies were not insolvent when they paid dividends after the three note sales. On the contrary, defendants argue that each of the Marvel Holding Companies had a surplus after the note sales. In support of their argument, defendants point to the certificates of fair

value that were issued by independent accounting firms for each of the notes.

LaSalle counters that a question of fact exists as to whether the Marvel Holding Companies were insolvent when the dividends were paid. LaSalle argues that it was improper for the Marvel Holding Companies to determine the value of their asset, Marvel stock, using the quoted price of the stock on a given day. LaSalle states that it intends to submit proof of insolvency through expert testimony at trial.

■ The court finds that the Marvel Holding Companies were not insolvent when they paid dividends after the note sales. The Marvel Holding Companies were not unable to pay their debts as they became due because the companies had no debts that were due. The assets of Holdings, Parent and Marvel III consisted almost entirely of Marvel stock. The liabilities of each company were the Holdings Notes, the Parent Notes and the Marvel III Notes, respectively. In each case, it is undisputed that the value of the Marvel stock owned by the Marvel Holding Companies far exceeded their liabilities under the notes.

Holdings owned 50.1% of Marvel. Merrill Lynch certified that the fair value of the 24 million shares of Marvel stock pledged as collateral for the Holdings Notes was $594 million. The face amount of the Holdings Notes was $517 million. Thus, the value of Holdings' assets that were pledged as collateral for the notes exceeded its sole liability by $77 million.

Parent owned 28.9% of Marvel and 100% of Holdings. Bear Stearns certified that the fair value of the 10 million shares of Marvel stock pledged as collateral for the Parent Notes was $489 million. The face amount of the Parent Notes was $252 million. Thus, the value of Parent's assets that were pledged as collateral for the notes exceeded its sole liability by $237 million.

Marvel III owned 100% of Parent. The Marvel III Notes were secured by all of the stock of Parent. In addition, Parent guaranteed the notes and pledged 9.3 million shares of Marvel stock as collateral for the guaranty. Merrill Lynch certified that the fair value of the 9.3 million shares of Marvel stock was $250 million. The face amount of the Marvel III Notes was $125 million. Thus, the value of the Marvel stock pledged to secure the Marvel III Notes exceeded Marvel III's sole liability by $125 million.

In response to this evidence, LaSalle contends that the method of valuation used by Merrill Lynch and Bear Stearns was "inherently unreliable." While LaSalle concludes that the Marvel Holding Companies were insolvent when they paid dividends after the note sales, LaSalle does not explain the method of valuation that it uses to reach that conclusion. Instead, LaSalle suggests that defendants' motion for summary judgment is premature and LaSalle states that it will submit proof of insolvency through expert testimony at trial.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The adverse party must set forth specific facts showing that there is a genuine issue for trial. *Id.;* Fed.R.Civ.P. 56(e). Rule 56(e) precludes a nonmoving party from resting on its pleadings to avoid summary judgment. *Celotex,* 477 U.S. at 317, 106 S.Ct. 2548.

LaSalle has not met its burden under Rule 56. In response to the valuation evidence submitted by defendants, LaSalle presents no contrary evidence. Because there is no genuine issue of material fact, the court concludes that the Marvel Holding Companies were not insolvent when they paid dividends after the note sales. Therefore, the officers and directors of the

Marvel Holding Companies did not owe a fiduciary duty to LaSalle and the other noteholders when they paid dividends to the Parent Companies.

The court will grant the defendants' motion for summary judgment on LaSalle's claims in Counts I through VI that the defendants breached their fiduciary duties to the noteholders when they used the proceeds of the notes to pay dividends to the Parent Companies.

### 2. Post–Bankruptcy Fiduciary Duties

#### a. Did officers and directors owe fiduciary duties to LaSalle?

LaSalle also contends that the officers and directors of the Marvel Holding Companies owed fiduciary duties to the noteholders when they filed bankruptcy petitions for the Marvel Holding Companies. Defendants do not dispute that the Marvel Holding Companies were insolvent when they filed for bankruptcy in December 1996. At that time, Marvel stock was trading at less than $3 a share. As a result, the liabilities of the Marvel Holding Companies under the notes exceeded the value of the Marvel stock that was pledged as collateral for the notes. Therefore, the officers and directors of the Marvel Holding Companies owed a fiduciary duty to the noteholders when they filed the bankruptcy petitions.

#### b. Did the officers and directors breach their fiduciary duties?

 The debtor in a Chapter 11 bankruptcy has a fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest. *See, e.g., In re Intermagnetics America, Inc.,* 926 F.2d 912, 917 (9th Cir.1991); *In re Harp,* 166 B.R. 740, 747 (Bankr.N.D.Ala. 1993) ("It is not easy for a debtor-in-possession, corporate or individual, to serve two masters-juggling the personal needs and desires of the debtor itself, with its clear fiduciary responsibilities to unse-

cured creditors, other parties in interest and the court.").

 The fiduciary duties that a debtor owes the estate are comparable to the duties that the officers and directors of a solvent corporation owe their shareholders outside bankruptcy. *In re Schipper,* 933 F.2d 513, 515 (7th Cir.1991) (holding that debtor's fiduciary duty to creditors is analogous to duties of corporate fiduciary). The debtor has a duty to use reasonable care in making decisions but once those decisions are made, the debtor is protected by the business judgment rule. *In re Schipper,* 109 B.R. 832, 836 (Bankr.N.D.Ill. 1989) (holding that there must be some business justification for debtor's actions in bankruptcy). Furthermore, the debtor has a duty of loyalty and must not engage in any form of self-dealing. *In re Tenn–Fla Partners,* 170 B.R. 946, 970 (Bankr. W.D.Tenn.1994) (holding that "debtor's concealing of the true market was an intentional act of self-dealing, which violated the debtor's fiduciary duty to creditors and to the court").

In this case, LaSalle alleges that the officers and directors of the Marvel Holding Companies breached their fiduciary duties to the noteholders by attempting to implement the Andrews Proposal and by taking other actions in the bankruptcy cases that were contrary to the best interests of the noteholders.

#### i. Attempting to implement the Andrews Proposal

LaSalle argues that the Andrews Proposal was not in the best interests of the noteholders because, if implemented, it would have diluted the value of the Marvel stock pledged as collateral for the notes. According to LaSalle, the officers and directors of the Marvel Holding Companies breached their fiduciary duty to the noteholders by proposing that Andrews invest $350 million in a restructured Marvel. Instead, LaSalle contends that Perelman somehow should have made the investment

through the Marvel Holding Companies so as not to dilute the noteholders' collateral.

The defendants counter that they did not breach their fiduciary duty to the noteholders by attempting to implement the Andrews Proposal. The defendants argue that they did not have an obligation under the indentures to invest in the Marvel Holding Companies as LaSalle alleges. Furthermore, defendants contend that the issue is moot because the Andrews Proposal was never implemented.

■ The court finds that the officers and directors of the Marvel Holding Companies did not breach their fiduciary duties to the noteholders by attempting to implement the Andrews Proposal. The offering memoranda for each of the indentures state that "[n]one of the affiliates of the Issuer will be required to make any capital contributions or other payments to the Issuer with respect to the Issuer's obligations on the Notes. . . ." Therefore, Perelman did not have a duty to invest in the Marvel Holding Companies and the noteholders could have had no reasonable expectation that Perelman would make such contributions. Moreover, Perelman did not breach his fiduciary duties to the noteholders by proposing to invest $350 million directly in Marvel, even if a natural consequence of that investment would have been a reduction of the noteholders' stake in Marvel.

### ii. *Defendants' actions in the bankruptcy cases*

LaSalle also contends that the officers and directors of the Marvel Holding Companies breached their fiduciary duties by taking actions in the bankruptcy cases that were contrary to the best interests of the noteholders. In particular, LaSalle alleges that the officers and directors breached their fiduciary duties by: filing the bankruptcy petitions; contesting the noteholders' motion to lift the automatic stay; and appealing adverse decisions by the court.

The defendants counter that their actions during the bankruptcy cases did not constitute a breach of fiduciary duty to the noteholders. The defendants argue that they were entitled to oppose the noteholders' motion to lift the automatic stay because the automatic stay protects both debtors and creditors.

There is no dispute that LaSalle and the officers and directors of the Marvel Holding Companies disagreed over the best way to restructure the companies in bankruptcy. While the officers and directors had a fiduciary duty to the noteholders at the commencement of the bankruptcy cases, the officers and directors also had other duties. For example, they had a duty to enforce the automatic stay to protect the Marvel Holding Companies and their creditors. *See Constitution Bank v. Tubbs,* 68 F.3d 685, 691 (3d Cir.1995) (finding that "[t]he automatic stay cannot be waived").

Officers and directors should have broad latitude to balance competing interests in a bankruptcy case in order to make decisions that are in the best interests of the estate. Ultimately, the court decides whether to implement those decisions. In this case, the court finds that the decisions by the officers and directors were reasonable and consistent with their fiduciary duties under the Bankruptcy Code.

For the reasons stated above, the court will grant defendants' motion for summary judgment on LaSalle's claims that the defendants breached their fiduciary duty to the noteholders by attempting to implement the Andrews Proposal and taking other actions in the bankruptcy cases.

### D. *Can Any of LaSalle's Other Claims Survive Summary Judgment?*

LaSalle asserts several additional theories to challenge Perelman's use of the proceeds from the notes to pay dividends to the Parent Companies. For the reasons set forth below, the court will grant defendants' motion for summary judgment on LaSalle's remaining claims.

### 1. *Tortious Interference with Contractual Relations*

Delaware courts recognize the tort of intentional interference with contractual relations as articulated by section 766 of the Restatement of Torts (Second). *Gillenardo v. Connor Broadcasting Delaware Co.*, 1999 WL 1240837, at *7 (Del.Super.Ct. Oct.27, 1999); *see also In re Kearney Chem., Inc.*, 468 F.Supp. 1107, 1111 (D.Del.1979). The Restatement provides:

> § 766. Intentional Interference with Performance of Contract.
>
> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

"The underlying principle of a tortious interference with contract claim is that a valid and enforceable contract was breached by the defendant, causing the plaintiff injury." *Gillenardo*, 1999 WL 1240837, at *7.

In this case, LaSalle contends that the defendants interfered with the indentures between the Marvel Holding Companies and the noteholders, causing the Marvel Holding Companies to breach their agreement to repay the notes. LaSalle alleges that the defendants interfered with their rights under the indentures by attempting to implement the Andrews Proposal and taking other actions in the bankruptcy cases that were contrary to the best interests of the noteholders.

Defendants counter that the tortious interference claim is moot because even if the terms of the Andrews Proposal would have violated the indentures, the proposal was not implemented. In addition, Defendants contend that their actions in the bankruptcy proceedings do not give rise to a claim for intentional interference with contractual relations.

█ The offering memoranda for each of the indentures state that Perelman and the Parent Companies are not required to make capital contributions to the Marvel Holding Companies. Moreover, the offering memoranda do not prohibit Perelman from making the $350 million contribution to Marvel that he would have made under the Andrews Proposal. Therefore, Perelman did not breach his duties under the indentures by attempting to implement the Andrews Proposal. In addition, the court finds that the actions taken by the officers and directors in the bankruptcy cases were consistent with their duties under the Bankruptcy Code and they did not breach the terms of the indentures. Accordingly, the court will grant defendants' motion for summary judgment on LaSalle's claims that the defendants intentionally interfered with the indentures.

### 2. *Unjust Enrichment and the Imposition of a Constructive Trust*

Throughout its amended complaint, LaSalle alleges that the Parent Companies were unjustly enriched when the officers and directors of the Marvel Holding Companies used the proceeds of the note sales to pay dividends to the Parent Companies totaling $550 million. In Count XI, LaSalle contends that the court should impose a constructive trust to remedy the alleged unjust enrichment.

█ Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del.1988); *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del.Ch.1999). The elements of unjust enrichment are: 1) an enrichment, 2) an impoverishment, 3) a relation between the enrichment and the impoverishment, 4) the absence of justifi-

cation and 5) the absence of a remedy provided by law. *Jackson,* 741 A.2d at 393–94. Under Delaware law, the court will impose a constructive trust when "a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty." *Id.* (quoting *Dodge v. Wilmington Trust Co.,* 1995 WL 106380, at *7 (Del.Ch. Feb.3, 1995)).

■ In this case, the court finds that there is no evidence that the defendants were unjustly enriched. The officers and directors of the Marvel Holding Companies did not owe a fiduciary duty to the noteholders when they paid dividends to the Parent Companies. Moreover, the offering memoranda for each of the indentures openly disclose that the proceeds from the notes will be upstreamed to the Parent Companies. The memoranda provide that "[a]ll net proceeds from the Offering will be distributed by the Issuer to its parent, and will not be available to the Issuer or its subsidiaries." It is not unjust for defendants to retain the proceeds of the note sales because the distribution of the proceeds to the defendants was a term of the indenture agreements to which LaSalle consented. Therefore, the court will grant defendants' motion for summary judgment on LaSalle's claims for unjust enrichment and imposition of a constructive trust.

### 3. *Piercing the Corporate Veil*

LaSalle suggests that the court should pierce the corporate veil of each of the Marvel Holding Companies and hold the Parent Companies, and ultimately Perelman, liable under the indentures as shareholders of the Marvel Holding Companies. LaSalle argues that this extraordinary step is justified because Perelman controlled the Marvel Holding Companies and used the corporate form to upstream the proceeds of the note sales.

■ "Persuading a Delaware court to disregard the corporate entity is a difficult task." *Harco National Insur. Co. v. Green Farms, Inc.,* 1989 WL 110537, at *9–10 (Del.Ch. Sept.19, 1989). In order to prevail on a claim to pierce the corporate veil and hold the corporation's shareholders liable, a plaintiff must prove that the corporate form causes fraud or similar injustice. *Wallace v. Wood,* 1999 WL 893577, at *5 (Del.Ch. Oct.12, 1999); *see also Skouras v. Admiralty Enters.,* 386 A.2d 674, 681 (Del.Ch.1978) ("Absent a showing of fraud or that a subsidiary is in fact the mere alter ego of the parent, a common central management alone is not a proper basis for disregarding separate corporate existence.").

■ In this case, the officers and directors of the Marvel Holding Companies hired independent accounting firms to verify that the dividends were proper. More importantly, the officers and directors disclosed that the proceeds of the note sales would be distributed to the Parent Companies. In sum, the undisputed facts do not show any fraud or similar injustice. The court finds that LaSalle has failed to demonstrate sufficient facts to justify piercing the corporate veil and holding Perelman liable for the debts of the Marvel Holding Companies. Therefore, the court will grant the defendants' motion for summary judgment on Count VII of LaSalle's complaint.

### 4. *Aiding and Abetting*

LaSalle contends that certain defendants aided and abetted the officers and directors of the Marvel Holding Companies in breaching their fiduciary duties to the noteholders. As set forth above, the officers and directors of the Marvel Holding Companies did not breach their fiduciary duty to the noteholders by attempting to implement the Andrews Proposal and taking other actions in the bankruptcy cases. Therefore, the court will grant the defendants' motion for summary judgment on Count IX of LaSalle's amended complaint.

### 5. *Civil Conspiracy*

In Count XII of its amended complaint, LaSalle alleges that the defendants committed civil conspiracy when they conspired to breach the fiduciary duties owed to the noteholders. Because the court has found that the defendants did not breach any fiduciary duties they may have owed to the noteholders, the court will grant defendants' motion for summary judgment on Count XII of LaSalle's amended complaint.

## III. *CONCLUSION*

This is a case where investors who purchased high-risk bonds are seeking to rescind the investments because the potential risks that they were warned of materialized. Each offering memorandum contains an abundance of warnings and cautionary language concerning the notes. Each offering memorandum discloses that "all net proceeds from the Offering will be distributed by the Issuer to its parent, and will not be available to the Issuer or its subsidiaries." Moreover, the offering memoranda disclose that the Marvel Holding Companies may have difficulty repaying the notes when they mature.

> The Issuer currently anticipates that in order to pay the principal amount of the Notes at maturity ... the Issuer will be required to adopt one or more alternatives, such as borrowing funds, selling its equity securities or equity securities of Marvel, or seeking capital contributions or loans from MacAndrews & Forbes or other affiliates. None of the affiliates of the Issuer will be required to make any capital contributions or other payments to the Issuer with respect to the Notes. There can be no assurance that any of such actions could be effected on satisfactory terms, that any of the foregoing actions would enable the Issuer to make any of the foregoing payments on the Notes or that any of such actions would be permitted by the terms of the Indenture....

Based on these disclosures, the court concludes that the noteholders were warned that the notes were a high-risk investment. Accordingly, the noteholders cannot complain because the potential risk that they were warned of materialized. As the U.S. Court of Appeals for the Third Circuit stated in another case rejecting the efforts of high-yield bondholders to collect from affiliates of a failed issuer, in language equally applicable here, "due to the disclaimers and warnings the prospectus contains, no reasonable investor could believe anything but that the [issuer's] bonds represented a rather risky, speculative investment which might yield a high rate of return, but which alternatively might result in no return or even a loss." *In re Donald J. Trump Casino Securities Litigation—Taj Mahal Litigation,* 7 F.3d 357, 369 (3d Cir.1993).

In this case, the court finds that the officers and directors of the Marvel Holding Companies did not owe fiduciary duties to the noteholders when they paid the dividends. Furthermore, the officers and directors of the Marvel Holding Companies did not breach their fiduciary duties to the noteholders by attempting to implement the Andrews Proposal and taking other actions in the bankruptcy cases. Therefore, as set forth above, the court will grant summary judgment in favor of the defendants and against LaSalle on all the claims in LaSalle's amended complaint.

The court will issue an order in accordance with this opinion.